**COURT OF APPEALS,**
**Feb. 26, 1907.**

## --THE PEOPLE EX REL. GEORGE W. PERKINS *v.* JOSEPH F. MOSS, ET AL.*

THE PEOPLE OF THE STATE OF NEW YORK, Appellant.

(187 N. Y. 410.)

(1). ARREST—ONE ARRESTED ON A CRIMINAL CHARGE BY INFORMATION ENTITLED TO WRIT OF HABEAS CORPUS BEFORE EXAMINATION— WARRANT IS A NULLITY IN THE ABSENCE OF ANY EVIDENCE TO SUSTAIN IT.

One arrested under a warrant issued by a magistrate charging him with a crime is not obliged to await an examination, but may at once resort for his protection to the writ of habeas corpus. (Code Civ. Pro. §§ 2015–2019; Code Crim. Pro. §§ 188–197.) The court upon such a proceeding will look back of the warrant and see if the facts stated in the depositions of the prosecutor and his witnesses conferred jurisdiction upon the magistrate to issue it (Code Crim. Pro. § 149); and unless there is some evidence to sustain it, the warrant is a nullity and the defendant is entitled to his discharge.

(2). EVIDENCE—WHEN DEFENDANT'S DECLARATION AS TO INTENT WITH WHICH AN ALLEGED CRIMINAL ACT WAS COMMITTED IS CONCLUSIVE.

The adoption, in its entirety, by the district attorney, of a letter written by the defendant, containing an explanation of his acts and affirmatively disclaiming any purpose to violate the law and which was used as proof of the facts upon which the prosecution based an application for a warrant of arrest for grand larceny, must be regarded as the use of a prior declaration made by the defendant, it was equivalent to his examination; and as such declaration affirmatively denied the existence of any criminal intent, and there was no inherent improbability therein and no other evidence from which such intent could be inferred, the magistrate had no jurisdiction to issue the warrant.

(3). GRAND LARCENY—APPROPRIATION BY DIRECTOR OF CORPORATE FUNDS FOR POLITICAL PURPOSES—IN ABSENCE OF EVIDENCE ESTAB-

* Affirming *Peo. ex rel. Perkins* v. *Moss*, 113 App. Div. 329, 20 N. Y. Crim. 75, *ante.*

LISHING FELONIOUS INTENT, MAGISTRATE HAS NO JURISDICTION
TO ISSUE WARRANT OF ARREST.

An information upon which a warrant of arrest was issued, charg-
ing the defendant with the crime of grand larceny in the first
degree, contained in substance the following facts:     The president
of an insurance company, in whom was vested, and who had for
years been exercising, the power to make disbursements of the
corporate funds upon his sole authority, had agreed that the in-
surance company would contribute to the presidential campaign
fund of the Republican national committee up to the amount of
$50,000, and to protect the company against other demands for
political purposes he requested the defendant, one of the com-
pany's trustees, to personally carry out the agreement by ad-
vancing the money.     The defendant acquiesced in the president's
request, advanced the money and, subsequently, the president
brought up the subject of his reimbursement, informally, before a
full attendance of the members of the finance committee of the
company.     The president's purpose was not that the finance com-
mittee should take official action in the matter, but that the trus-
tees should be informed of what he had done, and that he might
have their opinions upon the matter.     It was the general opinion
that the president should cause the relator to be reimbursed for
his advances out of the corporate funds; what was brought before
this body of the company's trustees was the claim or right of the
defendant to be paid the moneys which he had paid out by the pro-
curement of the president, in order that the latter's agreement on
behalf of the company might be carried out; the president, exer-
cising the executive power, with which he appears to have been
clothed, directed the treasurer of the company to draw a check for
the amount of the defendant's claim, which was made payable
and delivered to the firm of which defendant was a member; the
day before the issuance of the warrant the defendant, at the re-
quest of the district attorney, wrote a letter stating in substance
that the moneys alleged to have been feloniously appropriated
were received by him in satisfaction of his claim; that he had
acted in the honest belief that he was benefiting the company, and
had derived no personal advantage; this letter was used by the
prosecution as proof of the facts upon which the application for
the warrant was based.     *Held*, that the defendant might be re-
garded as having aided and abetted the act of the president of the
corporation in contributing corporate funds for the purposes of a
political campaign; that such act, at the time in question, was
neither a common-law nor a statutory crime, although it was be-

yond the purposes of the corporation and was wholly unjustifiable and illegal; that when the defendant took part in the appropriation of the moneys in question, unless he did so *animo furandi*, with the intent to steal it, he was not properly chargeable with the crime of grand larceny, whatever might be the civil consequences of his act; that the case was not only barren of any other evidence calling for the exercise of the judicial judgment of the magistrate as to whether there was probable cause to believe that the crime charged had been committed, but there being no inherent improbability in defendant's statement that he had acted in the honest belief that he was benefiting the company, in the absence of any evidence contradicting it, the magistrate had no jurisdiction to issue the warrant.

APPEAL from an order of the Appellate Division of the Supreme Court in the first judicial department, entered May 25, 1906, which reversed an order of Special Term dismissing a writ of habeas corpus and directed the discharge of the relator from custody.

Upon a warrant issued by a city magistrate of the city of New York, charging him with the crime of grand larceny in the first degree, the relator was arrested by, and taken into the custody of, a police officer. Thereafter, upon a petition to the Supreme Court, setting forth his arrest and averring that the warrant was unlawfully issued and that the petitioner was illegally restrained by virtue thereof, writs of habeas corpus and of certiorari were issued directed to the defendants the police officer and the city magistrate, and commanding the production of the relator and the certification of the cause of his imprisonment. Thereupon, the relator was brought before a Special Term of the Supreme Court and, upon the return made by the city magistrate to the writ of certiorari and after a hearing had, the writ of habeas corpus was dismissed and the relator was remanded into custody. Upon appeal to the Appellate Division, in the first department, this order was reversed and the discharge of the relator was ordered. The People then appealed to this court.

The information, upon which the warrant of arrest was issued, charging the relator with the crime of grand larceny in the first degree, was contained in certain depositions taken before the magistrate. One deposition was by Darwin P. Kingsley, a vice-president of the New York Life Insurance Company, which stated that, in December, 1904, when he was secretary of the finance committee of that company, a meeting was had of all of the members of the committee, including McCall, since deceased, who, as president of the company, was *ex officio* a member. It was stated by the president that, on behalf of the insurance company, he had promised to pay to Cornelius Bliss, as treasurer of the Republican national committee, for use in the presidential campaign of that year, such sums as should not exceed $50,000, and that Perkins, this relator, then a vice-president of the company, at his, the president's, request and to carry out the agreement with Bliss, had advanced to the latter large sums of money. McCall did not ask the committee to take any official action upon this statement, but desired to inform it of the facts. Conversation was had in regard to the matter and no official action was taken by the committee; but " it was the expressed opinion of those present that McCall should cause Perkins to be reimbursed, for the sums so advanced, out of the funds of the company." It was stated, also, in the deposition that McCall, " by virtue of his office, had power to make disbursements, known as disbursements upon executive order."

Another deposition was by Edmund D. Randolph, a trustee and the treasurer of the insurance company, who was present at the meeting of the finance committee referred to in the deposition of Kingsley, which corroborated Kingsley's statements as to what had taken place. Randolph stated that some time after the meeting in December, 1904, he drew a check to reimburse Perkins, the relator, for the moneys he had advanced to Bliss; that the payment was made by the treasurer's check to

the order of J. P. Morgan & Co., a firm of which Perkins was a member; that this check was drawn by himself pursuant to the direction of McCall the president; that, " at that time, large powers were vested in McCall as president to order disbursements to be made from the funds of the company without first submitting for approval to any committee; " that that power had been exercised " upon his sole personal authority " for many years without having been challenged and that Perkins had had nothing to do with the transaction of the drawing of the check, or of the book entries.

The deposition was taken of Thomas A. Buckner, a vice-president of the company, who identified a letter written by the relator to the district attorney the day before the issuance of the warrant of arrest. The relator's letter was written in response to the request of the district attorney for a statement of the former's connection with the contribution made by the insurance company to the Republican national committee, in 1904. From this letter it appears that Bliss, the treasurer of that committee, had informed the relator of the promise of McCall, the president of the company, that the company would contribute up to the sum of $50,000 towards the campaign; that McCall, upon inquiry, corroborated Bliss' statement and explained that, as demands had been made upon him for other political contributions by the company, which did not seem to him to be for its interest to make, " it would make it easier for him to refuse such demands, if the payment to the Republican Committee was not at that time made directly from the funds of the company; " that he asked relator to see Bliss and to make the payments personally and that he, McCall, " would see that the matter was taken care of later on; " that, accordingly, the relator advanced to Bliss, from his own resources, various sums amounting to $48,500; that in December, 1904, upon the subject of his reimbursement coming up between himself and the president, it was concluded to take the matter up with

the members of the finance committee and later, at a meeting of the committee, after McCall had explained, that, at his request, the relator had made the above advances and that provision should be made for reimbursement, " the conclusion was reached that the President should cause me to be reimbursed " and that a check to the order of the relator's firm of J. P. Morgan & Co., was afterwards drawn and delivered by the treasurer of the company. The letter concludes with this clause: " It never occurred to me that there could be any question as to the propriety of such expenditure, which I believed to be for the benefit of the Company. It has come to me as a total surprise that the legality of such payments should be questioned. While so asserting, it is not my intention to dispute or deny civil liability to account to the Company for these moneys.   *   *   * I derived no personal advantage of any kind from the transaction; and certainly I had no intent other than to serve the interests of the Company." The district attorney was authorized to make any use of the statements in the letter and the relator waived any privilege, or immunity, in connection with it.

*William Travers Jerome, District Attorney (Wallace Macfarlane* and *Edward B. Whitney* of counsel), for appellant. If there is any evidence in support of a magistrate's decision, it cannot be reviewed upon habeas corpus. (Code Crim. Pro. § 150; *Burr Case,* 25 Fed. Cas. 12; *U. S.* v. *Hughes,* 70 Fed. Rep. 972; *Horner* v. *U. S.,* 143 U. S. 570; *Kranskopff* v. *Tallman,* 35 App. Div. 273; *Swart* v. *Rickard,* 148 N. Y. 264; *Matter of Henry,* 13 Misc. Rep. 734; *People ex rel. Bungart* v. *Wells,* 57 App. Div. 140; *People ex rel. Farley* v. *Crane,* 94 App. Div. 397; *Matter of McFarland,* 59 Hun, 304; *People ex rel. Tweed* v. *Liscomb,* 60 N. Y. 559; *People ex rel. Danziger* v. *P. E. House of Mercy,* 128 N. Y. 180.) Perkins was an accessory before the fact, and, therefore a principal under sec-

tion 29 of the Penal Code. (*U. S.* v. *Gooding,* 12 Wheat. 460.) There was sufficient evidence before the magistrate to warrant his inferring that the payment was known or feared to be wrong, both by Perkins and by the treasurer. (*People* v. *Flack,* 125 N. Y. 324.) A corporate officer paying out funds of the corporation without consideration moving to it, and without authority of its members or directors, for a purpose foreign to its business (if not also against public policy) and known or feared by him to be wrong, although payments for that specific purpose have not been specifically covered by any provision of the Penal Code, nevertheless commits the crime of larceny. (*McKenna* v. *People,* 81 N. Y. 360; *People* v. *Flack,* 125 N. Y. 324; *U. S.* v. *Taintor,* 28 Fed. Cas. 7; *Bissell* v. *M. S. R. R. Co.,* 22 N. Y. 269; *Rex* v. *Cabbage,* R. & R. 292; *Rex* v. *Morfit,* R. & R. 307; *Regina* v. *White,* 9 C. & P. 344; *People* v. *Woodward,* 31 Hun, 57; *People* v. *Sherman,* 133 N. Y. 349; *People* v. *Dimick,* 107 N. Y. 13.)

*William N. Cohen, Lewis L. Delafield* and *Howard S. Gans* for respondent. That the money was paid openly and under a claim of right suffices to defeat the charge of embezzlement; this would be true even though it should be established that the claim was ill-founded. (1 Bishop on Crim. Law, 297, subds. 1, 2; 1 Whart. on Crim. Law, § 230; 2 Russell on Crimes, 163; *Rex* v. *Hall,* 3 C. & P. 409; *Regina* v. *Creed,* 1 C. & K. 63; *Regina* v. *Norman,* 1 C. & M. 501; *McCourt* v. *People,* 64 N. Y. 583; *People* v. *Burton,* 1 N. Y. Cr. Rep. 297; *People* v. *Grim,* 3 N. Y. Cr. Rep. 317; *People* v. *Ouley,* 7 N. Y. S. R. 794; *Devine* v. *People,* 20 Hun, 98; *Abrams* v. *People,* 6 Hun, 491.) The relator having paid out his own money to redeem the promise of the president of the New York Life Insurance Company made for the corporation, and having accepted repayment of the funds thus disbursed, there is no evidence of an appropriation of funds to a use other than that of the corpora-

tion, and the writ should be sustained by reason of the absence of that element of the crime. (Penal Code, § 528, subd. 2; *Koehler* v. *Reinheimer,* 26 App. Div. 5; *Leslie* v. *Lorillard,* 110 N. Y. 519; *Flynn* v. *B. C. R. R. Co.,* 158 N. Y. 493.) There is no evidence that the subscription was *ultra vires;* but even if it be assumed that it was beyond the corporate powers that circumstance tends neither to an inference that it was not to the corporate use nor to an inference of criminality. (*Paul* v. *Virginia,* 8 Wall. 168; *Hooper* v. *Cal.,* 155 U. S. 648; *N. Y. L. Ins. Co.* v. *Cravens,* 178 U. S. 389; *Nutting* v. *Mass.,* 183 U. S. 553; *Ingraham* v. *Reform Club,* 12 Phil. 264; *Hollis* v. *D. T. Sem.,* 95 N. Y. 166; *People* v. *Hawkins,* 157 N. Y. 1; *Matter of Lampson,* 161 N. Y. 511; Morawetz on Corp. § 556; *Holmes* v. *Willard,* 125 N. Y. 75; *Robertson* v. *Bullions,* 9 Barb. 64, 132.) Even if it be assumed that the subscription was an *ultra vires* act, there is no evidence that the relator had any reason to believe it to be such, and therefore no inference of wrongful intent, or of any criminal intent is to be drawn from the *ultra vires* act. (*Moss* v. *Cohen,* 158 N. Y. 240; *Myers* v. *State,* 1 Conn. 502; *State* v. *Nussenholtz,* 76 Conn. 93; *Goodspeed* v. *I. St. Ry. Co.,* 184 N. Y. 351; *Knowles* v. *City of New York,* 176 N. Y. 430; *Cutter* v. *State,* 36 N. J. L. 125; *Oberlander* v. *Spiess,* 45 N. Y. 175; *Meyer* v. *Amidon,* 45 N. Y. 169; *Taylor* v. *Com. Bank,* 174 N. Y. 181; *Rudd* v. *Robinson,* 126 N. Y. 113.) Criminal intent is a fact that must be found before the relator can be held. There is not sufficient evidence in the record upon which the finding can be based, and hence no crime is made out. (*People* v. *Wiman,* 148 N. Y. 29; *Stokes* v. *People,* 53 N. Y. 164; *People* v. *Powell,* 63 N. Y. 88; *People* v. *Plath,* 100 N. Y. 592; *People* v. *Flack,* 125 N. Y. 324; *Hewitt* v. *Newburger,* 141 N. Y. 538; *McCourt* v. *People,* 64 N. Y. 583; *People* v. *Baker,* 96 N. Y. 341; *People* v. *Burton,* 1 N. Y. Cr. Rep. 297; *People* v. *Grimm,* 3 N. Y. Cr. Rep. 317.)

GRAY, J. If the information, which was laid before the magistrate furnished no legal evidence of the commission of a crime by the relator, then he was illegally restrained of his liberty. If the facts shown did not warrant an inference by the magistrate of the existence of probable cause to believe that the crime charged had been committed, he was without jurisdiction to cause the arrest of the relator and the latter was entitled to resort at once for his protection to the writ of habeas corpus. Section 2015 of the Code of Civil Procedure provides that " a person imprisoned or restrained in his liberty, within the State, for any cause, or upon any pretence, is entitled, * * * to a writ of habeas corpus, or a writ of certiorari, as prescribed in this article, for the purpose of inquiring into the cause of the imprisonment or restraint, and, in a case prescribed by law, of delivering him therefrom." The petitioner is only required to state, among other things, that he " is imprisoned, or restrained in his liberty; the place where, * * * and the officer or person by whom, he is so imprisoned or restrained." (Sec. 2019, Code Civ. Proc.) The arrest of the relator was an actual restraint of his person, and he was not obliged to await an examination before the magistrate. The provision of the statute, in that respect, was for his benefit; in order that he might be informed of the charge and that he might have the opportunity to examine the witnesses and to make any statement in relation to the charge. (See Code Crim. Proc. secs. 188 to 197.) He could waive these proceedings, however, and immediately sue out the writs that the legality of his detention under arrest might be inquired into. The statute, which confers the right to the writ of habeas corpus, has always been construed in favor of the liberty of the citizen. The protection afforded by it against arbitrary and illegal arrest is within the guaranties of our Constitution, and the statutes of the state have always been intended to increase the facilities for the issuance of this great and valuable common-

37

law writ and to insure the prompt hearing and disposition of the petitioner's case.

If the magistrate issued the warrant of arrest without sufficient evidence in the particular case, the process is a nullity. The question, always, must be whether the magistrate acquired jurisdiction to cause an arrest of the person and the court, upon the habeas corpus proceeding, will look back of his warrant and see if the facts stated in the depositions of the prosecutor and his witnesses support his warrant. (Code Crim. Proc. sec. 149; Church Hab. Corp. sec. 236.) If they did not furnish reasonable and just ground for a conclusion that the crime charged had been committed and that the defendant committed it, then jurisdiction was lacking to hold the prisoner in custody for any time. (Code Crim. Proc. sec. 150.)

The relator had the absolute right to question, in this way, the sufficiency of the facts laid before the magistrate to constitute the crime of larceny. That crime is defined in section 528 of the Penal Code; which reads, so far as material, as follows: " A person who, with the intent to deprive or defraud the true owner of his property, or of the use and benefit thereof, or to appropriate the same to the use of the taker, or of any other person, * * * having in his possession, custody, or control, as a bailee, servant, attorney, agent, clerk, trustee, or officer of any person, association or corporation, * * * any money, property, evidence of debt or contract, article of value of any nature, or thing in action or possession, appropriates the same to his own use, or that of any other person other than the true owner or person entitled to the benefit thereof, steals such property, and is guilty of larceny."

It is apparent that what constitutes the crime of taking the property of another for the use of the taker, or of that of any other person than the legal owner, is the intention with which the act is committed. Under the statute, the crime of larceny no longer necessitates a trespass; but it does need, as an essen-

tial element that the "intent to deprive or defraud" the owner of his property, or of its use, shall exist. The intent, by necessary implication, as from its place in the penal statute, must be felonious; that is to say, an intent without an honest claim of right. It is not now essential, as it was under the Roman and early English law, that the intention of the taker shall be to reap any advantage from the taking. The statute makes the crime to consist in the intent to despoil the owner of his property. That is necessary to complete the offense and if a man, under the honest impression that he has a right to the property, takes it, it is not larceny, if there be a colorable title. (See Code Crim. Proc. sec. 548; *People* v. *Grim,* 3 N. Y. Cr. Rep. 317; Bishop's Crim. Law, secs. 297, 851; Wharton's Crim. Law, secs. 883, 884.) The charge of stealing property is only substantiated by establishing the felonious intent. Without it there is no crime; for it would be a bare trespass. It is the criminal mind and purpose going with the act, which distinguish the criminal trespass from a mere civil injury. (1 Hale's P. C. 509; *McCourt* v. *People,* 64 N. Y. 583.) Doubtless, if the particular act was specified in the penal statute, an honest belief that it was right, while it would purge the act from immorality, would not relieve it from indictability. But when there is no statute on the subject and the act is not one which concerns the state directly, because affecting the peace, order, comfort, or health, of the community, then the wrong done is private in its character and must be redressed by private suit. The act of the president of the insurance company, which the relator may be regarded as abetting, (Sec. 29, Penal Code), that is the contribution of corporate funds for the purpose of a political campaign, was not *malum prohibitum,* or a prohibited wrong; for it was not until two years later that it was made a misdemeanor by the law of 1906. (L. 1906, ch. 239.) The legislature may make that criminal, which was not so before; but we may not reason back of the enactment and

predicate crime of an act, which was lacking in criminal intent. It is of the very nature of crime that the criminal act shall involve the violation of a public law, or a wrong, which, because grossly immoral and vicious, affects the public injuriously.

If we turn then to a consideration of the facts, upon which the magistrate ordered the relator to be arrested, it is impossible reasonably speaking, to find that criminal element which the statute makes a necessary one, the intent of the accused to steal.

When summed up, the evidence amounts to this: that the president of the company, in whom was vested, and who had for years been exercising, the power to make disbursements of the corporate funds upon his sole authority, had agreed that the insurance company would contribute to the presidential campaign fund of the Republican national committee up to the amount of $50,000 and that, to protect the company against other demands for political purposes, he requested the relator, one of the company's trustees, to personally carry out the agreement, by advancing the moneys. The relator acquiesced in the president's request, advanced the money, and, subsequently, the president brought up the subject of his reimbursement, informally, before a full attendance of the members of the finance committee of the company. The president's purpose was not that the finance committee should take official action in the matter; but that the trustees should be informed of what he had done and that he might have their opinions upon the matter. It was the general opinion that the president should cause the relator to be reimbursed for his advances out of the corporate funds. The facts stated by the witnesses showed that what was brought before this body of the company's trustees was the claim, or right, of Mr. Perkins to be repaid the moneys which he had paid out by the procurement of the president, in order that the latter's agreement on behalf of the company might be

carried out, and that the president, exercising the executive power, with which he appears to have been clothed, directed the treasurer of the company to draw the check for the amount of the relator's claim. Furthermore, the prosecution in making use before the magistrate of the relator's letter to the district attorney, as an admission of the facts of the transaction complained of, not only made the fact clear that the moneys were paid out to satisfy the relator's claim, but, also, caused it to appear, affirmatively, that the relator had acted in the honest belief that he was benefiting the company and had derived no personal advantage. The magistrate was not bound to accept the letter as establishing the innocence of the accused; but, as a part of the evidence used to make out the charge, he had his statements explaining the transaction and stating his honest motives. It was equivalent to his examination.

It is, unquestionably, true that the purpose, for which the moneys of the company were promised, was foreign to the chartered purposes of the corporation; but that fact does not make the payment a criminal act. The act not being *malum prohibitum,* nor *malum in se,* the innocent motive of indirectly promoting the corporate affairs, through the supposed advantage of the continuance in power of the Republican administration, purged the act of immorality and it lacked the criminal intent. The company had not the right, under the law of its existence to agree to make contributions for political campaigns, any more than to agree to do other things foreign to its charter; but it had capacity to make agreements, if not prohibited, or inherently wicked. Its act would affect the interests of those concerned with the conduct of the corporate business and effect a private wrong; but it would not be a public offense, or illegal, in the sense of violating any public interest. (*Bissell* v. *M. S. & N. I. R. R. Co.,* 22 N. Y. 258; *Holmes* v. *Willard,* 125 ib. 75; *Moss* v. *Cohen,* 158 ib. 240.) If making the agreement to contribute from the corporate funds was an illegal act, it was

because of the limitations upon the corporate powers and not because of considerations of the disadvantage to the company of the act. There are a great many things, which those intrusted with the management of corporate properties are known to do and which they ought not to do, whatever their good motives, not because some statute forbids, but because they are not within the scope of the chartered powers. Their own sense of rectitude and of what is due to those who trust them should admonish them of the wrongful nature of their conduct. It has been well observed that the ultimate welfare of the citizen demands that he shall conform his conduct to the moral law and it concerns him that everyone else should conform to it. A moral obligation should be none the less authoritative in the conduct of life that it is binding, only, upon the conscience of the person as a duty and is imperfect in law from the absence of legal sanction. Courts, however, may not sit to judge the conduct of a defendant by any moral code, or rules of ethics. Their sphere is to ascertain if the facts shown establish the crime charged against him. In the facts stated in these depositions I find none, upon which criminality can be predicated. The essential element of the " intent to deprive and defraud " is nowhere to be found and there is no just basis for the inference. There was no concealment about the transaction and knowledge of it was conveyed to the other trustees. That the relator may have made a mistake of law, which will not relieve him from liability in a civil action, may be true, and he expressly disclaimed in his letter any intention to dispute such a liability; but this was a case where the intent, or good faith, was in issue and then knowledge of the law is immaterial. (*Knowles* v. *City of N. Y.*, 176 N. Y. at p. 439; *Goodspeed* v. *Ithaca St. Ry. Co.*, 184 ib. at p. 354.) The relator came to the aid of the president of the company, who, as such, had agreed to contribute moneys to the campaign fund, and advanced the moneys, temporarily. Having done so, for no other reason than for the supposed ad-

vantage of the company, his claim to be reimbursed from the treasury of the company is openly presented and it is paid. But within the spirit, if not the letter, of section 548 of the Penal Code, that was not larceny. The section provides that " upon an indictment for larceny it is a sufficient defense that the property was appropriated openly and avowedly, under a claim of title preferred in good faith, even though such claim is untenable." This section is an expression of the emphasis which the statute lays upon the intent with which the property of another is taken. It is a qualification of the provisions of section 528 of the Penal Code, defining what shall constitute the crime of larceny. It is of considerable significance, as illustrating the legislative understanding, that when, in 1906, the legislature dealt with the question, specifically, the offense was declared to be a misdemeanor, not a larceny.

The question in this case was whether the facts evidenced the commission of a crime and that was a question of law, which went to the jurisdiction of the magistrate. They showed that the design to injure, the motive to despoil the company, the wrongful purpose were, all, lacking in the information, which was laid before the magistrate and upon which the warrant was issued. This being so, the act of the magistrate was wholly without jurisdiction and the warrant and all the proceedings under it were absolutely void. (*Hewitt* v. *Newburger,* 141 N. Y. 538, 543.)

For these reasons, I advise the affirmance of the order appealed from.

HISCOCK, J.

I concur with Judge GRAY in the affirmance of the order appealed from.

Stripped of any collateral and immaterial considerations, such as that of the consequences which may result to the magistrate issuing a warrant without any legal basis therefor, the

naked question is whether any evidence was presented to such magistrate which showed reasonable ground for believing that the defendant had committed the crime of larceny. Unquestionably if there was no evidence justifying the inference of such guilt, the magistrate was without jurisdiction and the relator should be discharged.

This court seems to be wholly or practically unanimous in the opinion that the evidence presented to the magistrate would not be sufficient to sustain a conviction of the defendant for the alleged crime and that he should be discharged if convicted thereon. The nature of this case, the attention which it has received and the facts and circumstances disclosed render not at all violent the presumption that the district attorney has now presented all of the evidence within his reach, and, therefore, it is quite probable that the really practical question involved is whether the relator shall be discharged at the present or at a subsequent stage of the proceedings. But however this may be, it will be conceded, as is argued in behalf of the appellants, that if even a slight degree of evidence of the relator's guilt was produced—" something upon which the judicial mind was called upon to act in determining the question of probable cause," the magistrate had jurisdiction, the warrant was valid and the order appealed from should be reversed.

We are all agreed upon certain fundamental principles pertaining to this case. The contribution by the president of the New York Life Insurance Company from its funds of $50,000 to a political campaign committee, even in the absence of any statutory prohibition, was absolutely beyond the purposes for which that corporation existed and was wholly unjustifiable and illegal. And while the contribution was suggested and made by the authority and direction of the president of the company rather than by the relator, still the latter was so a party to the execution of the act that he must be regarded as

having aided and abetted it, and, therefore, is criminally responsible if a crime was committed.

Further than this, the assumption will be made without critical analysis of its correctness in all respects, that because the relator understood when he advanced his own funds to Mr. Bliss that the same would be repaid to him with moneys of the corporation, he was from the beginning a party to the plan to appropriate such corporate funds to an unauthorized purpose, and that, therefore, when payment was made to him he did not occupy the position of a *bona fide* though mistaken claimant, and does not come within those provisions of section 548 of the Criminal Code which provide that it is a defense to an indictment for larceny "that the property was appropriated openly and avowedly under a claim of title preferred in good faith, even though such claim is untenable."

But, confessedly, these facts and considerations alone are insufficient to justify the charge which has been laid against the relator. At the time of his arrest there was no statute making the contribution of corporate funds to political purposes of itself a crime, and, therefore, there must be some evidence that the relator in doing what he did was actuated by a felonious, criminal intent. It is agreed upon all sides that the crime of larceny may not be committed unintentionally, unconsciously or by mistake, but that in order to accomplish it the perpetrator must have the intent referred to. It may be difficult at all times exactly and satisfactorily to define this intent, but the requirement for it as applicable to this case means that when the relator took part in the appropriation of the moneys in question, he must have had in some degree that same conscious, unlawful and wicked purpose to disregard and violate the property rights of another, which the ordinary burglar has when he breaks into a house at night with the preconceived design of stealing the property of its inmates. There

is, as there ought to be in the absence of statutory enactment, a long distance between the act which is unauthorized and illegal and which subjects the trespasser to civil liability, and the one which is legally wicked and criminal and which subjects the offender to imprisonment. It is on this point of criminal intent that I think the district attorney has failed to furnish any evidence whatever on which the magistrate might act, although the burden affirmatively rested upon him so to do.

At the outset it must be borne in mind that some of the circumstances which surround this charge are merely accidental and superficial, and not at all decisive. The fact that this contribution was made by the officers of one of those corporations whose management recently has been subjected to grave criticism, and even that it was made for a purpose properly subjected to condemnation and now absolutely prohibited, are of no legal significance. However public opinion or ethics might distinguish them, the legal principles which control the consideration of this case are the same which would be applicable if the president of a manufacturing corporation had contributed from its funds toward the erection of a church supposed to be for the benefit of its employees, or the officers of a railroad company had contributed its funds or the use of its property and transportation facilities for the temporary relief of the sufferers from some sudden and great calamity. We probably should be compelled to say in each case that the contribution was beyond the purposes of the corporation and unauthorized and illegal and the officers making the same civilly liable, but it certainly would be a matter of grave import to hold, in the absence of something else, that they might be prosecuted for stealing.

It, therefore, seems to me that we are justified in scrutinizing with care the depositions presented to the magistrate for the purpose of ascertaining whether they do in fact disclose any intent to commit a crime.

Part of the evidence produced consisted of a written statement made by the relator at the request of the district attorney and by the latter adopted deliberately and in its entirety as proof of the facts upon which a warrant should be issued. It affirmatively disproves the existence of any criminal intent upon the part of the relator. It recites the facts which led him to make advances from his personal funds in the first instance and which attended his repayment afterwards, and distinctly disclaims any purpose to violate the law or to act otherwise than for the benefit of the corporation.

But it may be said that the magistrate was at full liberty to believe or reject this statement in whole or in part. It seems to me that this is too broad a statement of the law. Various authorities like *Becker* v. *Koch* (104 N. Y. 394) and *President, etc., Manhattan Co.* v. *Phillips* (109 N. Y. 383), may be found holding that upon the examination of an adverse witness, the party calling him is not as a matter of law bound by explanations or adverse statements which he may make, but that he may ask the jury to disregard the same. But an examination of these cases will show that the jury were permitted to disregard such explanations or statements only because they were contradicted by other facts appearing or by inherent probabilities. Moreover, it is well recognized that especial consideration has been accorded to the exigencies liable to arise upon the examination of a hostile witness where the party compelled to call him cannot anticipate the form which his evidence will take. The natural rules by which to measure the force of relator's statement in this case are those which have been framed in respect to the use of statements and admissions made by a party outside of the trial. In such a case the party attempting to use the admission knows beforehand just what it is and there is less need for liberal rules in his behalf than in the other case. It is well settled that where use is made in a judicial proceeding of a prior declaration the entire declara-

tion at the time made so far as relevant must be taken together; a party may not utilize only so much of the declaration as is for his benefit, but he must also admit that which is against his interest and the whole must stand or fall together. If in a suit upon a note the plaintiff relies for evidence upon the statement of the defendant that he gave the note, he must also accept an accompanying declaration that the note has been paid in full and if this is all the evidence the statement stands as a whole and the proofs fail. (*Carver* v. *Tracy*, 3 Johns. 427; *Wailing* v. *Toll*, 9 Johns. 140; *Credit* v. *Brown*, 10 Johns. 364; *Mumford* v. *Whitney*, 15 Wend. 380; *Rouse* v. *Whited*, 25 N. Y. 170; *Platner* v. *Platner*, 78 N. Y. 90, 103.)

It is only where that part of the declaration which discharges the party making it is in itself highly improbable or is discredited by other evidence that the court may believe one part of the admission and reject the other. (*Kelsey* v. *Bush*, 2 Hill, 440.)

These rules are especially applicable and equitable in this case, for here the district attorney requested the relator to make the statement in question, and after the latter had done this with apparent fullness and frankness, waiving all those rights and privileges which he had in a criminal prosecution, the former official deliberately, after opportunity for full consideration, employed it as a proper statement of facts upon which the magistrate might act.

It seems to me that not only is there no evidence *aliunde* the statement which contradicts it in the respects wherein it is favorable to the relator, but that upon the other hand the depositions confirm it and indicate the absence rather than the presence of a criminal intent to steal the money of the corporation.

Concededly the relator derived no pecuniary gain from the expenditure. It does not appear that he had any personal or political end to serve by the contribution, but, so far as we

know, individually, he may have been deeply interested in the success of some opposing party. He entered upon the plan of expenditure only at the instigation and request of the president of the company and not of his own original volition. While it appears that the president of the company did suggest this form of contribution as a method, good or bad, logical or otherwise, of deceiving and putting off other applicants for contributions, there is no evidence that the relator ever attempted to conceal his acts, but upon the other hand they were disclosed fully even to the criminal authorities when so requested. No request was made to the officers of the campaign committee for concealment of the fact which was known to them that this was a contribution from the funds of the insurance company. When the time for repayment arrived the president of the company, although accustomed by virtue of his general powers and without specific authority to make what were known as "disbursements upon executive order," disclosed to the entire finance committee of the insurance company what had been done by the relator and the purpose to repay him from the corporate funds, and while no formal resolution was passed upon the subject every member of such committee approved of such payment.

Some importance seems to be attached to the entries which were made upon the books of the company in respect to this repayment and to the fact that the check was made payable to the firm of which the relator was a member rather than to him personally. It affirmatively appears that the relator had no part in making or any knowledge of the entries upon the books of the company, and that the check in repayment was made under the direction of the president of the company rather than the relator.

These facts are all established and must be accepted by the prosecution as true, and there is wanting every one of those circumstances of personal gain, furtive secrecy in the commis-

sion of the act and of concealment after commission which, as essential elements, ordinarily attend the crime of larceny, and if there is any evidence here of. a criminal intent it is found simply and solely in the fact that the officers of the corporation have contributed some of its funds to an unauthorized purpose. As already indicated it does not seem to me that this fact is sufficient to sustain the burden thus cast upon it.

In *McCourt* v. *People* (64 N. Y. 583) the plaintiff in error stopped at a house and asked the daughter of the owner for a drink of cider, offering to pay for it. She refused to let him have it, and he thereupon opened the cellar door, and although forbidden to do so by her, went in and drew some cider. He was indicted for burglary and larceny and it was held that the trial court committed error in refusing to direct his acquittal. It was said: " Every taking by one person of the personal property of another, without his consent, is not larceny; and this, although it was taken without right or claim of right, and for the purpose of appropriating it to the use of the taker. Superadded to this, there must have been a felonious intent, for without it there was no crime. It would, in the absence of such an intent, be a bare trespass, which, however aggravated, would not be a crime. It is the criminal mind and purpose going with the act which distinguishes a criminal trespass from a mere civil injury." And then further, as applicable to the particular circumstances of that case, " There was not only an absence of the usual indicia of a felonious taking, but all of the circumstances proved are consistent with the view that the transaction was a trespass merely. To find this transaction a larceny it is necessary to override the ordinary presumption of innocence and to reject a construction of the prisoner's conduct, which accounts for all the circumstances proved without imputing crime, and to impute a criminal intention, in the absence of the ear marks which ordinarily attend and characterize it."

It is true that this was said with reference to the evidence produced upon a trial, but a decision denying as matter of law to given facts the requisite probative force must be applicable at any other stage where there is need for such proof.

CULLEN, Ch. J. (dissenting).

I dissent from the decision about to be made. The relator having been arrested under a warrant charging him with the commission of grand larceny, sued out in the Supreme Court a writ of habeas corpus, in aid of which a certiorari was issued. On the return to the writs the relator was remanded to custody by the Special Term. This order was reversed by the Appellate Division and the relator discharged, and from that order an appeal is brought to this court.

That the warrant was sufficient on its face is unquestioned, and the ground on which the relator has been discharged is that the depositions before the magistrate were insufficient to justify the issue of the warrant. Doubtless, where there is no evidence in the depositions tending to show the commission of the crime and the guilt of the defendant, the court may go behind the warrant and discharge the prisoner. (Church on Habeas Corpus, sec. 286.) But there must constantly be borne in mind the radical distinction between the proof requisite for the issue of a warrant and that required for conviction on the trial of the defendant. In the latter case the proof must establish guilt beyond a reasonable doubt. In the former it is sufficient that the evidence shows reasonable ground to believe that the defendant had committed a crime (Code of Crim. Pro. sec. 150), or, as commonly said, a case of probable cause. If there is no evidence whatever justifying the inference of guilt the magistrate acts without jurisdiction, the process is illegal, and both the magistrate and the party suing out the warrant are liable as trespassers. But if " the evidence produced was colorable—something upon which the

judicial mind was called upon to act in determining the question of probable cause "—the magistrate had jurisdiction and the warrant was valid. (*Pratt* v. *Bogardus,* 49 Barb. 89.) It must be further borne in mind that the relator was discharged before examination, and the distinction between a discharge upon the warrant and the depositions on which it was issued and a discharge after examination is important. In the first case the discharge proceeds on the theory that the arrest is absolutely illegal, the case being destitute of any evidence of guilt calling for a judicial determination, while after examination the Supreme Court, as the successor of the King's Bench, may, even on habeas corpus, review the evidence and reverse the decision of the magistrate. But, as pointed out by Church in his work on Habeas Corpus (Sec. 234; see also Hurd on Habeas Corpus, chap. 6, secs. 3, 4 and 5), such power in reality springs from the superiority and appellate power of the court issuing the writ, and not from the Habeas Corpus Act. Therefore, the question presented to us is the same as that which would arise were the relator to sue the magistrate for false imprisonment in having issued the warrant. If in such an action the court ought to instruct the jury that, as a matter of law, the arrest of the relator was illegal, the relator has properly been discharged; if not, not.

We are, therefore, brought to the question whether there was any evidence in the depositions tending to show that the relator had been guilty of a crime; for " when the proof has a legal tendency to make out a proper case, in all its parts, for issuing the process, then, although the proof may be slight and inconclusive, the process may be valid, until it is set aside by a direct proceeding for that purpose." (*Miller* v. *Brinkerhoff,* 4 Denio, 118.) In *Swart* v. *Richard* (148 N. Y. 264) it was held that a deposition stating " deponent believes and has reason to believe that said store was broken into and burglarized by James H. Swart and Wallace Van Evera and another, from

the fact that said parties were about that time, *i. e.,* after one o'clock that night prowling around and near the premises," was sufficient to give the magistrate jurisdiction to issue the warrant and to defeat an action for false imprisonment. In that case Judge MARTIN, writing for the court, said: "The deposition contained a statement of facts which was sufficient to call upon the magistrate for judicial consideration and determination, and tended to prove the guilt of the respondent."

It is not necessary to consider whether the facts stated in the depositions would make out a case of larceny at common law; because for more than a century embezzlement by clerks, agents and officers had been made criminal by statute, and the effect of the Penal Code was to abolish the distinction between the two crimes and make both larceny. By section 528 of the Penal Code, "A person who, with the intent to deprive or defraud the true owner of his property, or of the use and benefit thereof, or to appropriate the same to the use of the taker, or of any other person. * * * Having in his possession, custody, or control, as a bailee, servant, attorney, agent, clerk, trustee, or officer of any person, association or corporation * * * any money, property, evidence of debt or contract, article of value of any nature, or thing in action or possession, appropriates the same to his own use, or that of any person other than the true owner or person entitled to the benefit thereof; steals such property, and is guilty of larceny." The depositions show that in September, 1904, the relator, who was a trustee and vice-president of the New York Life Insurance Company, had a conversation with the president of said company, in which the latter stated that he had promised to contribute to Cornelius N. Bliss, treasurer of the Republican national committee, the sum of $50,000, or so much thereof as might be necessary for the purposes of the Republican campaign. It was then substantially agreed between the parties that the relator should pay the money out of his own funds

38

and thereafter be repaid by the company. In pursuance of this understanding the relator did pay Bliss sums aggregating $48,500. On December 30, 1904, the relator demanded repayment of the sums advanced by him, which was made by order of the president through the method of a check of the company drawn, not to the order of the relator personally, but to that of J. P. Morgan & Company, a firm of bankers of which the relator was a member. This occurred at a meeting of the finance committee at which the relator's agreement with the president was stated, but no vote authorizing the payment was taken and no minutes of the transaction entered. In the stub of the company's check book the entry was made, " No. 7283 Dec. 30, 1904, Charge Hanover Office a.c Order of J. P. Morgan & Co. 48,702.50," and in the books of account, the following: " 1904, Dec. 30. Hanover Office Account charged—Treasury Department. Cheque J. P. Morgan & Co. $48,702. 50. Entry made by Mattison. Hanover Bank Office Account: Charged Ledger Bo. 3.—Treasury Department. 1904. Dec. 30. By order of President $48,702.50. Entry made in ledger by Mattison." In the deposition of Darwin P. Kingsley it is averred that the president of the company " by virtue of his office, had power to make disbursements known as disbursements upon executive order; and that said president did not ask the committee as such to take official action on the transaction narrated, but desired to inform the committee of the facts." There was submitted to the magistrate a written statement made by the relator to the district attorney, in which he admitted the understanding with the president as to the payment of the moneys by him to Bliss, and their repayment by the check of the company. He denied knowledge of the entries in the company's books and asserted that when he made the advances and was reimbursed therefor " it never occurred to me (him) that there could be any question as to the pro-

priety of such expenditure, which I believe to be for the benefit of the Company."

It is also unnecessary to consider whether the relator as an officer of the company had at the time in his " possession, custody or control," the funds or property of the company within the provisions of the Penal Code. Certainly the president had such custody and control, and by section 29 of the Penal Code a person who aids or abets the commission of a crime or directly or indirectly counsels its commission, is equally a principal with the person who commits the acts. Nor have the provisions of section 548, that it is a sufficient defense to indictment for larceny that the property was appropriated openly under a claim of title in good faith, any application to the case. The crime, if there was any in this case, commenced when the original agreement was made between the relator and the president, by which the money of the company was to be appropriated to the use of Bliss and the method was adopted, for the · purpose of concealing such appropriation, that the relator should in the first instance pay the money to Bliss and thereafter receive the money of the company. The repayment to the relator was not an independent transaction, but part of the original scheme, and must stand or fall with the legality or criminality of that scheme.

It thus appears that by the joint action of the relator and the president of the company this large sum of money was taken from the funds of the company and given to Cornelius Bliss for expenditure for political purposes. Mr. Bliss, neither in his personal nor in his representative capacity had any claim on the company for the money, legal, equitable or moral. The company was to be permanently deprived of it, for it never was to be returned, nor was any consideration to inure to the company for the money paid. The purpose for which it was to be employed was wholly foreign to the business of the corporation and one in which the company had no possible inter-

est, except that of every citizen in the good government of the country. That this was an illegal misappropriation of the company's funds, for which every director or officer engaged therein was personally liable to the corporation, seems to me too clear for debate. A majority of the Appellate Division so held, and as I read the opinion of my brother GRAY this court is of the same opinion. Hence it is unnecessary to pursue the discussion of this question further. The relator, therefore, falls exactly within the provisions of the Penal Code, so far as the act is involved, not dealing for the moment with the question of the relator's intent and his belief as to his own authority or that of the president. He has without right deprived the company of its property and appropriated the same to the use of another person not the owner nor entitled to the benefit thereof.

But it is said by the judges of the Appellate Division that the misappropriation of the moneys was simply *ultra vires* and not illegal, and reliance is placed upon a quotation from the opinion of Judge COMSTOCK in *Bissell* v. *Michigan Southern & N. I. R. R. Co.* (22 N. Y. 258) where he said: " A subscription made by authority of the board of directors and under the corporate seal, for the building of a church or college, or an almshouse, would be clearly *ultra vires,* but it would not be illegal. By a singular fatality there has been entirely overlooked the very next sentence to the one quoted: *" If every corporator should expressly assent to such an application of the funds,* it would still be *ultra vires,* but no wrong would be committed and no public interest violated."  Doubtless the action or contract of a corporation may be *ultra vires* and yet be vicious in no other respect, but also the action of a board of directors of a corporation may be not only *ultra vires,* but criminal. If a bank should purchase and operate a railroad the action would be, in the absence of any statutory provision on the subject, simply *ultra vires,* and the corporation could

not defend an action against it by a passenger for personal injuries on the plea that the operation of the road was beyond its corporate powers. If, however, the directors of a bank should direct the assets of the corporation to be divided among themselves to the exclusion of the stockholders, the action would not only be *ultra vires,* but on the part of the directors who might receive the money under the resolution simply theft. The appropriation of the funds or property of a corporation towards an enterprise or business upon which the corporation is not under its charter authorized to embark, is merely *ultra vires,* if the enterprise is prosecuted for the benefit of the corporation. But when the money or property is applied, not for the use or benefit of the corporation, but for that of third persons, the act is either a tort or a crime, regardless of the question whether the purpose to which the money is applied is one which the corporation under its charter might or might not have pursued. In other words, where the money is applied to the use of a corporation, but to an unauthorized use, it is *ultra vires;* where it is applied to the use of third parties it is a wrong.

There is this further answer to the argument of the Appellate Division. There is no proof that the corporation authorized the payment to Bliss, and as it would have been an illegal act on the part of the directors (from whom it seems to have been concealed), it must be assumed in the absence of proof to the contrary that it was not authorized. "Power to bind the corporation can be presumed to exist only in its executive agents and officers within the scope of its ordinary business and their ordinary duties." (*First National Bank of Lyons* v. *Ocean National Bank,* 60 N. Y. 278.) It appears by a statement in one of the affidavits already quoted that the president by virtue of his office "had power to make disbursements known as disbursements upon executive order." Plainly the authority so given to the president was solely to make dis-

bursements for the use and benefit of the corporation. If that is to be construed as an authority for the president to appropriate the moneys of the company for whatever purpose he chose, and for the benefit of any person he might desire to befriend, regardless of any interest of the corporation in the appropriation, then it is sufficient to say that all the parties were engaged in a criminal conspiracy to loot the company, and this instead of relieving the relator from responsibility would emphasize his offense. It must be remembered that the relator was not a mere clerk or subordinate, to whom the word of the president was law, and whose means of livelihood might be dependent on the president's favor, but a trustee and vice-president of the company, and a member of one of the greatest banking firms in the country. He owed the company the duty, not only of abstaining from participating in any misappropriation of the funds by the president, but of aggressive action against the president to prevent or expose such misappropriation. Surely, no one will pretend that the authority so given the president would have authorized the relator to advance, with the agreement for repayment from the company's funds, $50,000 to buy a diamond necklace for a woman, and there is nothing wrong in buying a necklace for a woman if a man pays for it with his own money. There is a distinction between the two cases, in that it is even more apparent in the necklace purchase than in the payment to Bliss, that the expenditure was for a subject in which the corporation had no interest. But the very distinction proves that the authority of the president was not unlimited or unqualified. It is only fair to the relator, however, to say that his claim is not that the authority of the president was unlimited, but his belief that the payment was for the benefit of the company, and, therefore, within the authority of the president.

Something is also said in the opinion below of the beneficient character of the purpose to which the money was appropriated.

Of that we can hardly take judicial notice. Probably at all times it would be regarded as beneficient in Vermont and maleficient in Georgia, while in New York its character would vary from year to year. The meritorious character of the object to which the money was appropriated has no bearing on the question of larceny. The gist of that offense is not the application of money to a bad purpose, but taking money that does not belong to the taker to appropriate to an object good or bad. It is the fraudulent deprivation of an owner of his property that constitutes larceny. It is a crime to steal, even though with the intent to give away in charity and relieve distress. (*Regina* v. *White,* 9 C. & P. 434.) I do not assert that it is immaterial which party is in control of the government of the nation and that the subject is a matter of indifference to the citizen. If this were so, the profession of political faith would be mere hypocrisy. If the citizen, with his own means, contributes to legitimate political expenses to secure the success of the party which he deems will most inure to the welfare of the nation, his action is laudable, and even if the inducement be the belief that the success of that party will inure to the advancement of his political interest, as distinguished from that of the country at large, it may be justifiable; but to apply the money of another without his consent to such an object is neither laudable nor justifiable, but dishonest. The money given to Bliss belonged neither to the president nor to the relator, but was simply in their custody. Its legal owner was the artificial being, the corporation; its beneficial owners were the policyholders. With the immense business carried on by the corporation, policies issued in every part of the country and to persons of every political party, both the relator and the president must have well known that the universal asssent of the policyholders, the only thing which could have justified, even morally (not legally), the payment to Bliss, could never be obtained and that at all times a substantial minority would be opposed to such

payment.   But though there was an illegal misappropriation
of the corporate funds by the relator this does not necessarily
prove that he was guilty of larceny.   It may have been simply a
trespass for which he is only civilly liable.   I agree with Judge
GRAY that to constitute larceny there must be what is termed
a felonious intent, but we do not make progress towards the
determination of the question before us unless we ascertain
what is a felonious intent.   The question has given rise to
much   discussion   in   text   books   and   in   judicial   opinions.
Whether " intent " is the proper term to employ may well be
doubted.   Though a man may commit many statutory offenses
unwittingly, no one can become a thief or an embezzler acci-
dentally or by mistake.   To constitute the offense there must
be in the perpetrator the consciousness of the dishonesty of the
act.   This,   however,   as   frequently   turns   on   the   knowledge
or belief of the party as to his authority as on his intent re-
garding the disposition of the property.   It is not necessary
either at common law or under the statute that   the   intent
should be the profit of the taker, for as already said it is theft
to take property to give away as well as to keep for oneself.
In the present case no one will doubt that had a clerk taken
from the company's till a sum of money to give to the Republi-
can club of his ward it would have been larceny.   Whatever
distinction there may be between the hypothetical case and that
of this relator does not lie in the object for which the moneys
were appropriated, for that in each case would be the same, but
in the difference between the authority over the corporate funds
possessed by the mere clerk and by the president and vice-presi-
dent.   The clerk, of course, would know that he had no au-
thority to so divert the corporate funds; the president and the
relator might, though they should have known to the contrary,
possibly have entertained a different view on the subject.   This
brings us to the real and, to my mind, the only question in this
case.   As has been already said, the relator and the president

of the company, without the authority of the corporation and knowing that all the beneficial owners would never assent to the act, took the moneys of the company without consideration and appropriated them to the exclusive use of a third party. The relator must be presumed to have known the law and to have intended the natural consequences of his acts, which were to deprive the company of the money. If he knew the illegality of his act and his intention was solely to benefit either Mr. Bliss personally or the political organization which he represented, then he was guilty of larceny. If, however, as asserted in his statements to the district attorney, he believed that the expenditure would be for the benefit of the company and that the president had the power to make the same, then, however mistaken on the subject, he was not guilty. This was necessarily and properly a question of fact to be determined by the magistrate, not one of law. Though the prosecution put in evidence before the magistrate the written statement of the relator, the magistrate was at liberty to believe it or to reject it in whole or in part. (*People* v. *Van Zile,* 143 N. Y. 368, 9 N. Y. Crim. Rep. 330; *Becker* v. *Koch,* 104 id. 394; *President, etc., Manhattan Co.* v. *Phillips,* 109 id. 383.) The indirect method in which the payment to Mr. Bliss was made and the fact concealed by having the money in the first instance advanced by the relator instead of by the company, and the method in which the relator was reimbursed by a check, not to him personally, but to the order of J. P. Morgan & Company, a banking firm with which the corporation may have large legitimate dealings, casts suspicion on the good faith of the relator, and might be considered by the magistrate as militating against him. The explanation of this course offered by the relator, that it was to relieve the president from solicitations from other political parties, might also be discredited. It is difficult to imagine how the representatives of other parties would have access to the company's books; nor would

the scheme of payment enable the officers of the company when solicited to say that the company had made no contributions to other parties, because such an answer would be as essentially a falsehood as if the money had been paid by the company in the first instance. The concealment of the payment as described would warrant the magistrate in finding that the parties were conscious of wrongdoing in making it and feared exposure. The relator asserts that he was ignorant of the character of the entries made in the company's books, and there is no proof to the contrary of this statement. But he must have known that the check to pay him was drawn, not to himself, but to Morgan & Company. On the other hand, there is, doubtless, to be considered in the relator's favor the fact that he made no pecuniary profit by the transaction and that he afterwards openly admitted his participation in it. All this, however, merely raised a question of fact to be passed on by the magistrate, with whose determination other courts cannot interfere in the proceeding.

In the very recent case of *Tyson* v. *Bauland* (186 N. Y. 397), which was an action for false imprisonment, the plaintiff, a woman entirely reputable but in the humbler walks of life, was arrested for theft in a department store. The prosecuting witness had placed her bag containing money with other articles on a counter in the store while she was examining goods. The bag was missed. Afterwards the plaintiff was discovered with it going towards the door. She surrendered it to the prosecuting witness, stating that it had been given to her by a woman in another part of the store, who directed her to carry it to a lady whom she would find at the door. On opening the bag it was discovered that the money had been taken therefrom. The plaintiff was arrested, but the grand jury evidently believed her story, for it failed to indict. Thereupon she brought the suit for false imprisonment. We said that the officer was not bound to accept the plaintiff's explanation, and that on the facts

there was probable cause for the arrest, although the plaintiff
was in fact innocent. It may be in the present case that the
relator's character is so good and his standing so high that either
on the examination or on the trial it will seem clear that he
could not have consciously and knowingly misappropriated the
money of the company. It is also but fair to the memory of
the president, who is now deceased, to say that it is entirely
possible that his standing and character may appear to have
been equally as good. The relator is entitled to the full benefit
of the presumption arising from such character when presented
at the proper place and before the proper tribunal. But, of
course, nothing of that nature appears or can appear in the
depositions on which the warrants were issued. However high
the standing and character of the relator may be, it does not
justify a departure in his case from the same orderly course of
procedure in the administration of justice which would be
followed in case of the humblest citizen charged with an
offense.

As to the questions discussed in the opinion of Judge HIS-
COCK, with the utmost deference to my learned brother I insist
that the rule already stated by me of the right of the magistrate
to credit part of the statement of the relator and reject the rest,
applies with the same force to an admission made out of court
and put in evidence by the prosecution as it would to testimony
given by the relator on the trial itself. I dissent from the
doctrine " that where use is made in a judicial proceeding of
a prior declaration the entire declaration at the time made, so
far as relevant, must be taken together; a party may not utilize
only so much of the declaration as is for his benefit, but he
must also admit that which is against his interest and the whole
must stand or fall together," though it may be that my brother
intends this to be qualified by his subsequent statements. If
the proposition is correct, then the action of the district at-
torney in laying before the magistrate the declaration of the

relator was without justification, because he had proof outside
of that declaration of the facts showing the commission of the
offense.    But I respectfully insist that the law is the reverse.
The rule is thus stated by Mr. Greenleaf, referring to admis-
sions made not on the trial: " But though the whole of what
he said at the same time, and relating to the same subject,
must be given in evidence, yet it does not follow that all the
parts of the statement are to be regarded as equally worthy of
credit; but it is for the jury to consider, under all the circum-
stances, how much of the whole statement they deem worthy
of belief, including as well the facts asserted by the party in
his own favor, as those making against him " (Greenleaf on
Evidence, sec. 201); and referring to confessions in criminal
prosecutions: " The jury may believe that part which charges
the prisoner, and reject that which is in his favor, if they see
sufficient grounds for so doing."    (Id. sec. 218.)    Of course,
if the only evidence against a party is his admission or con-
fession then the adverse party cannot rely on the admission
without taking the explanation.    The cases cited by my learned
brother are of that nature.    Even that rule, however, is not
unqualified, for if the explanation is improbable then it may
be rejected, though there is no evidence against the party mak-
ing it other than the declaration.    (*Penfield* v. *Jacobs,* 21 Barb.
333.)    The case of *Kelsey* v. *Bush* (2 Hill, 440) asserts the
principle: " If that part of the confession which discharges the
party is in itself highly improbable, or if there be evidence
aliunde, *though but slight,* tending to discredit it, the jury may
believe one part of the confession and reject the other."    In
fact, however, under the Code of Criminal Procedure the ques-
tion can never arise in this bald form in a criminal prosecution,
for a conviction cannot be supported by the confession of the
defendant without additional proof to show that the crime
charged has been committed.    (Sec. 198.)

The voluntary character of the admission of the act charged

against him is doubtless to be considered on the question of his good faith. But the weight to be accorded it may depend very much on the circumstances under which it was made. If, when the charge was first publicly made that the money of the company had been appropriated for a political contribution, the relator admitted the fact and justified it, his conduct would be potent, if not conclusive, evidence in his favor. The offense is charged to have been committed in December, 1904. The relator's declaration was made in March, 1906. If, during this interval, there was a complete exposure of the transaction upon evidence taken before some tribunal or legislative body, of such a conclusive character as to render denial futile and unavailing, the voluntary character of the relator's admission might be deprived of its merit. Any clever offender might, under similar circumstances, not unnaturally, adopt the same course. Of the circumstances under which the admission was made we have, however, no knowledge, but on an examination before the magistrate those circumstances would appear.

The case of *McCourt* v. *People* (64 N. Y. 583) decided no new principle of law. A similar case seems to have arisen as far back as the time of Elizabeth, when a traveler meeting a fisherman, who refused to sell him fish, forcibly took the fish from him but left with him money exceeding their value. (2 East's Pleas of the Crown, 661.) Both cases proceed on the theory that as the party paid or offered to pay more than the value of the goods taken there could be no fraudulent intent. That principle has no relevancy to the present case.

The recent statute prohibiting political contributions by corporations (Laws of 1906, chap. 239), and punishing officers and agents making such contributions as for a misdemeanor does not bear on the question before us. The statute now makes the payment of such contributions criminal, though even every stockholder and every director of the company should expressly authorize and direct it. But returning to the illustra-

tion of the clerk taking the money of the corporation from the till to give to his ward club, the statute will not reduce his offense from larceny to a misdemeanor. The charge against the relator is not that he paid the money to Bliss and received it back from the company, by the authority of the corporation, but that the payment and repayment were made without that authority.

The order of the Appellate Division should be reversed and that of the Special Term affirmed.

WERNER, J. (dissenting). If the question were whether the relator's guilt of the crime of larceny as charged in the information had been established according to the immemorial rule which obtains in criminal trials, and which imperatively demands proof of guilt beyond a reasonable doubt to justify a conviction, I should unhesitatingly vote in the negative, for the evidence which the magistrate had before him when he was called upon to issue the warrant concededly falls far short of that standard. But that is not the question before us. The only question we are called upon to consider, and indeed the only one we have the right now to decide, is whether the evidence before the magistrate invested him with jurisdiction to issue the warrant; in other words, whether the evidence before him was of such a character as to impose upon him the duty of judicially determining whether there was probable cause to believe that the crime charged had been committed. It is not our province now to inquire whether his decision may have been correct or erroneous, but our duty begins and ends in passing upon his right to decide that question at all. If he had before him any evidence calling for the exercise of his judicial judgment as to whether there was probable cause to believe that the crime charged had been committed, it invested him with jurisdiction, and in that event the writ of habeas corpus issued herein must be dismissed. I think there was evidence enough

before the magistrate to give him jurisdiction, and, therefore, vote for reversal of the order of the Appellate Division upon the opinion written by Chief Judge CULLEN.

O'BRIEN and EDWARD T. BARTLETT, JJ., concur with GRAY and HISCOCK, JJ.; CHASE, J. concurs with CULLEN, Ch. J., and WERNER, J.

Order affirmed.