[No. 21527. Department One. May 31, 1929.]

THE STATE OF WASHINGTON, *Respondent*, v. WILLIAM T. POST, *Appellant*.[1]

*U. E. Harmon* and *Hayden, Langhorne & Metzger,* for appellant.

*John A. Sorley, Bertil E. Johnson,* and *H. B. Gardner (John H. Binns,* of counsel), for respondent.

BEALS, J.—An information was filed against the defendant in this action, the charging portion of which reads as follows:

"That the said William T. Post in the county of Pierce, in the state of Washington, on or about the 15th day of July, Nineteen hundred and 27 then and there being unlawfully and feloniously obtained from Tom Desmond, sheriff of Pierce county, Washington, possession of the sum of $881.04, lawful money of the United States of America, the property of Pierce county, Washington, being money from the liquor fines fund of said county, by color and aid of fraudulent and false representations and pretenses and by

[1]Reported in 278 Pac. 164.

means of false writings, to wit, by presenting to said sheriff and to F. Campbell, Jr., county auditor of Pierce county, Washington, false and fraudulent vouchers and a false and fraudulent affidavit signed and sworn to by said William T. Post, purporting to show that said William T. Post and one George Desmond had expended the sum of $2,206.50 lawful money of the United States of America on behalf of said sheriff in the investigation of offenses in said Pierce county against the liquor laws of the state of Washington, whereas in fact they had so expended the sum of $1,325.46 and no more, and that said William T. Post on said date, on obtaining possession of said sum of $881.04, lawful money of the United States of America, being the difference between the amount actually expended, and the amount paid to him as the expense of said investigation, then and there converted the same to his own use with intent to deprive and defraud the owner thereof, contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the state of Washington.''

The trial of defendant resulted in a verdict of guilty, and from a judgment on the verdict and sentence, defendant appeals.

The facts of this case are extremely complicated. The trial lasted for two weeks. The record is voluminous and includes very many exhibits.

The facts giving rise to the prosecution of appellant are, briefly stated, as follows: During the month of May, 1927, Thomas Desmond, the then sheriff of Pierce county, requested his son George Desmond and appellant to institute and carry on an investigation with a view to the arrest and prosecution of persons violating the state laws against possession and sale of intoxicating liquor in Pierce county. Desiring to avoid doing anything which might give notice to law violators that an investigation was in progress, the sheriff did not make any advance requisition on the fund available for such investigations, the proposition being

undertaken by appellant without any considerable advance of cash.

Appellant was engaged in the real estate and contracting business, and had in his employ one E. R. Small, who had previously been employed as a Federal prohibition agent. Appellant hired three investigators or under-cover men, Alexander McFaydn, Charles Kelly and Robert Gibson, who were to work for expenses and wages to be paid out of the Pierce county liquor fund. Mr. Small was to keep account of the disbursements by the men and advances made to them, but was not to receive any compensation from the county.

Sheriff Desmond and his son George Desmond claim to have advanced expense money in the sum of $800, $290 of which was delivered to appellant; the balance of $510 they claim to have delivered to Robert Gibson, who admitted the receipt of a considerable sum from George Desmond.

It was contended by the state, as charged in the information filed against appellant, that the cost of the investigation amounted to $1,325.46 (or thereabouts), it being alleged that appellant claimed that the same had cost the sum of $2,206.50. The campaign continued from May 14 to July 7, 1927, and on the evening of the last mentioned date, the parties met at Mr. Small's house, where the accounts were checked over, vouchers signed by the under-cover agents, McFaydn's voucher being for $198.85, Kelly's for $218.95, and Gibson's for $785.15, which sums included their wages and expenses. Two additional vouchers were signed, aggregating $139 for the alleged cost of an automobile, stenographic services, gas and oil for the automobile, etc., the total amount of the vouchers being, as testified on behalf of the state by Mr. Small, $1,367.95.

On the morning of July 8, appellant took the

vouchers to Sheriff Desmond for the purpose of having a claim made against the liquor fines fund by which means appellant would be reimbursed for his advances. Sheriff Desmond, discovering that only $290 of the $800 which he and his son had advanced for the investigation was included in the total of the vouchers, testified that he suggested to appellant that the vouchers be altered and raised in amount, so as to include the money which the sheriff and his son had advanced, as well as other items of disbursement which it was claimed had been made in the course of the investigation. Some of the dates of expenditures as shown by the vouchers were also changed, being moved back anterior to July 1, as only expenditures made prior to July 1 could be paid out of the particular money in the fund which the sheriff desired to appropriate to that purpose, the law requiring that the unused balance on July 1 be turned over to the state. After the vouchers were altered to the satisfaction of Sheriff Desmond, he placed on each one his certificate in the following form:

"I hereby certify on honor that the above described claim was necessarily incurred and the same has actually been paid by me for Pierce County. (Signed) Tom Desmond, County Sheriff."

And attached to the collection the following affidavit:

"I, Tom Desmond holding the office of county sheriff having herewith presented my account for the expenses for the period ending June 30, 1927, accompanied by vouchers numbered 1 to 25, inclusive amounting to the sum of $2,206.50 I do hereby, having first been duly sworn depose and say: That the foregoing account is just and true as therein stated; That no payment has been received by me on account thereof; That no rebate of any character, kind or description has been made to me by any person or persons furnishing any of said railroad or steamboat transportation, horse hire or subsistence; That the expenses

charged were actually and necessarily incurred by me in lawful money, and that each voucher herewith accompanying said account was actually written out and duly signed by the person whose signature thereon appears at the time of payment of said money and before the delivery of the same to me, and the amount thereon was mutually understood.    Tom Desmond.

"Subscribed and sworn to before me this 7th day of July A. D. 1927.                                L. H. Flood
"Deputy County Auditor."

On presentation of the claim by the sheriff to the county auditor, the latter refused to draw a warrant to cover the same, because the claim "was not drawn up properly and presented in the proper form." Thereafter the matter was taken up with the office of the prosecuting attorney, in which office identical affidavits were prepared for appellant and George Desmond to swear to, the affidavit signed by appellant being as follows:

"I, William T. Post, working without salary as special investigator having herewith presented vouchers ending June 30th, 1927, and numbered 1 to 25 inclusive and numbered and amounting to the sum of $2,206.50, I do hereby having been duly sworn depose and say that the foregoing account is just as therein stated, and that no rebate of any character kind or description has been made to me by any person or persons.

"That the expense charged was actually incurred by me in the gathering evidence of liquor law violators; that we have actually uncovered evidence on thirty-eight separate violators.                    William T. Post.

"Subscribed and sworn to before me this 12th day of July, 1927.                                Chas. D. Savory,
"Notary Public in and for the State of Washington."

The auditor testified that a deputy prosecuting attorney suggested to him that, if appellant and George Desmond would make such affidavits, the same "ought to be satisfactory for the payment of the claim."

While, by these affidavits, each affiant is made to swear that he had disbursed the sum of money therein mentioned, the auditor testified that he understood perfectly that it was not contended by anyone that two distinct disbursements of $2,206.50 had been made, but that both affidavits referred to the disbursement of the same sum as that vouchered for by Sheriff Tom Desmond. Upon receiving these affidavits, the county auditor drew and delivered to Sheriff Desmond a warrant, payable to Mr. Desmond's order, on the liquor fund for the amount called for by the requisition filed by the sheriff. The sheriff indorsed the warrant to appellant, who cashed the same and delivered to the sheriff out of the proceeds thereof the sum of $800, retaining the rest to reimburse himself for money advanced to the special agents, and otherwise expended, as per appellant's statement, as presented to the sheriff.

The state contends that the cost of the investigation was less than $1,400, and that appellant was guilty of larceny in procuring the issuance and delivery to Sheriff Desmond of the warrant in the sum for which the same was drawn. The sheriff testified as a witness on behalf of the state, and admitted the making of the suggestion that the vouchers be raised in amount, and that certain of them be altered as to dates contained therein, and admitted the making and presentation to the county auditor of the claim for the sum in which the warrant in his favor was drawn.

In connection with this matter, Sheriff Desmond testified in part as follows:

"Q. (by counsel for the state, referring to the vouchers submitted by appellant to the sheriff July 8) Did you at any time add those up to see what the total amount was, Mr. Desmond? A. No, I did not. Q. What, if anything, was done to those vouchers on that occasion, Mr. Desmond; were they changed in any way

in your presence? A. Yes, sir. Q. In what way? A. Mr. Post had brought those vouchers in signed for the amount that he had expended himself. Q. Was that his statement to you? A. Yes, sir, that is, that he had expended, and what was coming to those men. I might say that I never saw those men, you know, up to that time, didn't know who they were or anything about them; and I said, 'Well, now, there is $510 that my son has expended in addition to what has been given to you. We are into this $800, and that $800 has to be taken care of, and you will either have to get other vouchers signed or fix this up so as to take care of it.' And he had receipts and cancelled checks that he had paid out on, and I had some receipts there, as you know. You know about those receipts. And we added those receipts up again and made the total come out on the sub-voucher. I didn't think there was anything dishonest in that at all, Mr. Binns, or I would not have done it. Q. Mr. Desmond, did you scrutinize those receipts and checks carefully as to their genuineness and so on as to the signatures? A. I did not, Mr. Binns; you know I didn't do that. Q. Mr. Desmond, you stated a moment ago that certain changes were made in the vouchers? A. Yes, sir. . . ''

''(Cross-examination) Q. Now, Mr. Desmond, when you came to make out the voucher on the form that is here made out, on whose suggestion did you distribute your $510 over these vouchers that Mr. Post had these men sign? A. That was my suggestion. Q. Your suggestion? A. Yes, sir. Q. And it was at your suggestion that this $510 was put in on these vouchers that Post had had these men sign? A. Yes, sir. Q. Now, sheriff, I notice that you made up a statement in your office to which your attention has been called, didn't you? A. Yes, sir, I had one of my men do it. Q. Now, did Mr. Post ever see that statement? A. I don't think so; he did not, he was not present when this statement was made, and then this statement was taken together with the sub-vouchers and the voucher to the county auditor. I do not think Mr. Post saw it. Q. Now, sheriff, on that statement it appears that certain of these operators were paid

before they commenced to work; that is, I think it will appear by the evidence. Now, I want you to explain that fully to the jury so they will understand your reason for making up that statement as you did. You know the provisions of this law, and it would be surprising if every member of the jury or anybody else knows much about it. Just tell the jury why you made it up that way. A. The money that was in that fund would revert to the state on the first of July unless there was a claim presented against it. The investigation was not closed up on the 30th of June, they were still working. There were two or three places that I wanted to get very bad and they were working on them, so it did not close up until the 7th. Then I wanted to use them taking out John Does and Jane Does and so on that my men did not know anything about. I wanted to use a couple of them. Q. That was after the first of July? A. Yes, sir, along the 7th or 8th of July. Q. Shortly after the first? A. We wanted to pay the men out of the money that was within this fund for the time they had put in. I took the July time they worked and put it on the first part of May; in other words, the number of days they worked would be the same. The amount of money coming to them would be the same, but the time they worked in July we put back in May. Q. So as to accomplish what end? So as to get the money? A. Yes, sir, so as to get the money. Q. The money that you and Post had expended? A. Yes, sir, that was due, and to get the money to pay the claim that was within the fund. I could not see anything dishonest; anything connected with this booze investigation is irregular. . . .

"(Redirect examination, after discussion and in reply to a question by counsel for the state as to whether or not the witness could tell from the vouchers which were exhibited to him what the original amounts thereof had been) Yes, sir; I would not be positive on it. I would not be positive, as a matter of fact, on any of these, just what the amount was in the first place and what the change brought about. I am only positive in this, that the amount spent by—or advanced by myself and my son—was added into the original sub-vouchers that Mr. Post had. I would not be clear

at all on just even how it was done, only that it was added in, no more. Q. You cannot say which vouchers were altered or how much? A. I could not, Mr. Binns, I could not. Q. Perhaps you will be able to tell us about some of them. Take a look at the next one, A-1, and see if you can tell how much that one was raised? A. No, I could not tell you that either. I might tell you this, Mr. Binns— Q. Was the second one raised at all? Was A-1 raised at all? A. Well, now, I could not say that either, Mr. Binns; it don't appear to be. It appears to be the original, don't it (handing to counsel); I don't see any erasures there. Q. Look carefully under the sixty written out in ink and tell me if you don't see pencil marks there, one of which looks like a capital F? A. No, I would not say that. I might say for your information though, Mr. Binns, that I didn't have any of those sub-vouchers in my hands at all at that time. Q. Were the alterations made by you then, Mr. Desmond? A. No, no; no, I didn't have—all I had to do with these vouchers— all I did do on these vouchers was to certify them. I certified to all of them, as I had confidence that the thing was all right, as you know. You know I have. And I certified to them, giving my name and official position, to the correctness of it, while at the same time I had to take the word of somebody, you know, for it. Q. And you did so take the word of Mr. Post? A. Oh, yes, unquestionably. Q. Just run through these sub-vouchers, if you will, Mr. Desmond, and see if there are any that you can pick out where you can tell us what the original amount was. Examine the amount line particularly and it may help you. A. (witness examines vouchers) I know they were changed all right, Mr. Binns, but I cannot show you just how much or how about it. Q. Now, where was this changing of the vouchers done, Mr. Desmond? A. In a room adjacent to Judge Chapman's court room. Q. On what date, if you remember? A. I would not be sure on that, it was along the 7th or 8th of—I think we went right into your office with the claim, that same day. Q. Your best recollection is that it was about the 7th or 8th of July? A. Yes, sir. Q. And by whom were

the changes made? A. By Mr. Post, but I want you to understand, Mr. Binns, that I am as much or more to blame as Mr. Post for that change, because I suggested it.''

It is evident from the record, including the testimony quoted, that the vouchers were altered at the suggestion of the sheriff, in order to include the amount which he and his son claimed to have advanced by way of expense money and to make all the vouchers bear date prior to July 1. Mr. Desmond also testified that appellant had nothing to do with the preparation of, and did not even see, the statement made up by the sheriff for presentation to the county auditor.

Section 2601, Rem. Comp. Stat., defines larceny as follows:

''Every person who, with intent to deprive or defraud the owner thereof—

''(2) Shall obtain from the owner or another the possession of or title to any property, real or personal, by color or aid of any order for the payment or delivery of property or money or any check or draft, knowing that the maker or drawer of such order, check or draft was not authorized or entitled to make or draw the same, or by color or aid of any fraudulent or false representation, personation or pretense or by any false token or writing or by any trick, device, bunco game or fortune-telling; . . .

''Steals such property and shall be guilty of larceny.''

The intent to defraud is one of the essential elements of the crime of larceny. This felonious intent on the part of appellant must be established by the state before he can be found guilty of the crime with which he stood charged.

''The fourth and last essential of larceny is that the property of another which is taken and carried away without his consent should be taken with a felonious intent, or, as it has been differently expressed, with

knowledge that the act is wrong, and this intent is as necessary under statutes declaring it to be larceny to steal particular kinds of property as it is at common law or under general statutes.'' 36 C. J. 761.

*People ex rel. Perkins v. Moss,* 187 N. Y. 410, 80 N. E. 383.

Appellant contends that the record fails to show on the part of appellant any felonious intent to steal money belonging to Pierce county or anyone else, and that consequently there is no basis upon which the verdict of guilty can rest.

It must be borne in mind that appellant was not tried for forgery or for perjury. Appellant was tried for the crime of larceny, the state itself calling, as witnesses on its behalf, Sheriff Desmond and his son George Desmond who testified, *inter alia,* that they had advanced, for the purposes of the investigation, the sum of $800. It would seem that no person could be convicted of the crime of larceny, of which the intent to defraud is an essential element, on account of acts done with the intention of procuring, from the county, reimbursement for money actually expended in such a campaign as that conducted by appellant under the direction of the sheriff, unless the person making such claim knew that, for some reason or other, the money expended did not constitute a valid claim against the county. The essence of the matter is the good or bad faith of the claim as made. An honest mistake of fact or law will not subject a person to conviction of the crime of larceny. The conduct of the sheriff and appellant in raising and altering the vouchers was, of course, absolutely inexcusable, and so utterly foolish and silly as to seem almost beyond the bounds of belief, but the state admits that appellant's accounts and vouchers, as presented to the sheriff on the morning of July 8, were at least approxi-

mately correct as to amount. The sheriff then took charge of the matter, and appellant may be excused for relying upon the "suggestion," which, of course, amounted to a direction, on the part of the chief executive officer of the county, as to the method to be followed in preparing the statement which was to serve as a basis for reimbursement of the parties for the advances which they had made. It is certainly true that, whatever appellant did, he did, at least to some extent, on the advice and with the full knowledge of some official of his county. The very affidavit in which he stated that he had disbursed the twenty-two hundred odd dollars, making up the total claim as presented by the sheriff, was written in the office of the prosecuting attorney after a conversation between appellant and a deputy of that office. Of course these facts would not excuse appellant in any way, if, in fact, he was carrying out a felonious intent to defraud the county, but they cannot but be considered in determining the basic fact as to whether or not the record shows the felonious intent to steal which must be established before the conviction of appellant can be upheld.

In determining this question, this court cannot, of course, pass upon disputed questions of fact. All such questions have been determined adversely to appellant by the verdict of the jury, but it is for us to say whether or not the record shows facts which satisfy the requirements of the law in establishing all essential elements of the crime charged.

The testimony throughout the case is extremely conflicting and unsatisfactory. Appellant, in testifying as to the amount in which the vouchers were raised by himself and the sheriff, testified to two different amounts, both of which are manifestly ridiculously incorrect. The testimony of the three investigators is, on many points, unsatisfactory, and the accounts

are to the last degree complicated and confused. There can be no question but what there are many inconsistencies in appellant's accounts and the statements which he has made, from time to time, including his testimony on his trial.

The state earnestly contends that appellant's accounts and vouchers, together with his testimony, show gross irregularities and contradictions. This is certainly true, but do they show a felonious intent on the part of appellant to defraud the county?

It may be admitted that the county was legally liable only for money actually disbursed by the special agents in the course of their investigation, paid these agents by way of salary or necessarily expended in furthering the campaign, and that, if appellant or the sheriff, through his son George, turned over to the investigators money which they misappropriated, such expenditure by appellant or the sheriff would form no proper basis for a claim against the county, but the obtaining of money from the county on a claim based in part upon the payment of money to the investigators for which they did not properly account, even though ill-founded in law, is not larceny if the claim against the county was made in good faith.

The state insists that the vouchers signed July 7 contained all of the legitimate expenses of the investigation, plus $40 which the state contends represents an unlawful profit made by appellant upon an automobile which he purchased and turned over to the state, less possibly $26 which remained due to investigator Kelly. In other words, the state takes the position that the account, with vouchers, as submitted by appellant to the sheriff on the morning of July 8, was very nearly correct. Respondent further contends that the fact that $510 had been advanced to investigator Gibson by or through George Desmond, did not, as a

matter of fact, raise or lower the cost of the investigation, but "was merely a matter of private bookkeeping." This latter contention is undoubtedly correct, but the state produced Sheriff Desmond and his son George Desmond as witnesses on its behalf, who testified that this money had actually been advanced by them, some to appellant and some direct to the investigators. The state's witness Robert Gibson also testified that a considerable advance had been made to him by George Desmond.

It being then the theory of the prosecution that this money had actually been advanced as part of the expense of the campaign, and Sheriff Desmond testifying that appellant's account as submitted to him July 8 was raised at his, the sheriff's, suggestion in the sum of approximately $800, and it being admitted by all parties that appellant, immediately, upon cashing the warrant issued to the sheriff, delivered to the sheriff the sum of $800, we are unable to find in the record evidence which supports the finding of felonious intent to defraud on the part of appellant. Foolish he was, and credulous to the last degree, carelessly dependent upon irresponsible persons for the keeping of most important records and accounts, willing to blindly follow suggestions, no matter how ridiculous, made by persons in whom he had confidence. All this is amply proven by the record before us, but that appellant at any time had the felonious intent to steal from or defraud Pierce county, is not shown.

The judgment appealed from is reversed with instructions to dismiss the action.

PARKER, FULLERTON, TOLMAN, and HOLCOMB, JJ., concur.