THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* DAVID WEISS, NATHAN WEISS, SONGOOD REALTY COMPANY, INC., LOUIS GRETSCH and HERBERT GRETSCH, Defendants.

County Court, Kings County, December 12, 1939.

*William F. X. Geoghan, District Attorney* [*Michael Kern, Assistant District Attorney*, of counsel], for the plaintiff.

*Thomas Craddock Hughes*, for the defendants Louis Gretsch and Herbert Gretsch.

FITZGERALD, J. The indictment herein contains eight counts. In the first and second counts all of the defendants are charged with grand larceny in the first degree and in the eighth count with conspiracy. In the third, fourth and fifth counts Songood Realty Company and the defendants David and Nathan Weiss are charged with grand larceny in the first degree and in the sixth and seventh counts the Weisses are charged with forgery in the third degree.

The defendants Gretsch have moved to dismiss the indictment as to them on the ground that the legal and competent evidence before the grand jury is insufficient as a matter of law.

The charges arise out of alleged diversions of building mortgage loans to purposes other than those authorized by law.

In the first and second counts it is alleged that Songood Realty Company and the Weisses, as officers and directors thereof, received respectively, the sums of $3,250 and $5,330.24 as a trust fund under section 36 of the Lien Law for payment of the cost of an improvement of real estate and diverted such funds for other purposes in violation of section 1302 of the Penal Law.

Each of said counts recites " that the defendants Louis Gretsch and Herbert Gretsch willfully and feloniously aided and abetted the said Songood Realty Company, Inc., and David Weiss and. Nathan Weiss, and counselled, induced and procured the said Songood Realty Company, Inc., and the said David Weiss and Nathan Weiss in the commission of the said acts, and received and accepted the said sum of money in partial payment of the said debt and obligation, being well aware and knowing that the said sum of money thus received by them was paid out of the trust fund theretofore created pursuant to the provisions of the Lien Law of the State of New York as aforesaid; that all of the acts herein set

forth were committed willfully and unlawfully by the defendants pursuant to a common scheme or plan to divert Trust funds, and against the form of the Statute in such case made and provided and against the peace of the People of the State of New York and the dignity."

The moving defendants do not challenge the sufficiency of these counts, so their adequacy will be assumed.

It appears from the testimony before the grand jury that in 1937 the moving defendants contracted to purchase certain real estate known as the southeast corner of Seventy fourth street and Shore road, borough of Brooklyn. The title was in the Bronx County Trust Company. The agreed price was $33,250, paid by a purchase-money mortgage of $30,000 and the balance in cash.

At that time the Songood Realty Company, Inc., had been incorporated but had done no business. The Gretsches got control of the company and took title to the premises in its name by deed dated June 17, 1937. The mortgage given by the Songood Company to the trust company recites that it is a purchase-money mortgage; that upon payment of $15,000 on account of the principal thereof it would be subordinated to a permanent building loan mortgage of specified terms. It also contained the following clause:

" 16. That in compliance with Section 13 of the Lien Law, the mortgagor will receive the advances secured by this mortgage as a trust fund to be applied first for the purpose of paying the cost of the improvement, and that the mortgagor will apply the same first to the cost of the improvement before using any part of the total of the same for any other purpose."

It is apparent that no funds were received by the mortgagor upon the execution of this mortgage. The significance of that fact will appear later.

The only testimony as to the purpose of the Gretsches in acquiring the premises is that it was for resale at a profit.

Subsequent to the purchase one Lafrach paid $500 deposit on a contract to purchase the property. The sale was not consummated. Thereafter Moran and Goldberg became interested in the property. They deposited $500 on a contract of purchase. Moran applied to the Prudential Insurance Company for a permanent building loan in the sum of $300,000. Plans were prepared for a six-story elevator apartment house.

The application was made by Thomas Moran. He submitted a statement, verified February 11, 1938, in which it is recited that he is the owner of the premises, and in which are set out items aggregating $467,000 as the cost of the proposed improvement.

It was further stated that Moran had $30,000 invested in the premises, which were subject to a $30,000 mortgage. Attached to the sworn statement was a paper as follows: " Financial Statement of Songood Realty Corporation and Woodlawn Construction Corporation. Thomas Moran, Pres., 4352–196th Street, Flushing. Arthur Goldberg, Treasurer, 1544 East 24th Street, Brooklyn."

There were then set forth in detail alleged resources consisting of equities in four parcels of real estate and a cash item of $70,000, totaling $188,000.

In addition two banks — the Irving Trust Company and the Public National Bank — were given as Moran's references.

The application for the permanent building loan was accepted by the Prudential.

At the time Moran was not president of the Songood, nor did he have any interest in it whatever. The contention of the People is that the Gretsches were a party to a deception practiced upon the Prudential; that they were familiar with the contents of the statements filed by Moran; that the statements were prepared in Gretsches' office and that what was done was part of the conspiracy with which all the defendants are charged.

The only evidence relative to the application, however, outside of the documents, is the testimony of Herbert Gretsch, who emphatically denied knowledge of the contents of the financial statement, and testified that Moran, in representing himself as the owner and as president of the Songood, as he was under contract to purchase the property, could be president or fill any other office.

The application for the building loan having been approved, the ability of Moran and Goldberg to proceed with the improvement became contingent upon their obtaining a temporary loan of $100,000. All efforts to do so were futile. Moran could not obtain such a loan, and Herbert Gretsch, whose business was largely negotiating such loans as a broker, could not do so. The People endeavored to obtain an admission from Herbert Gretsch when he appeared before the grand jury that he had agreed to back Moran and Goldberg to the extent of $100,000, but Gretsch denied that such an arrangement was made; and there is no evidence that such an agreement ever existed. The matter laid dormant for a short time until the defendants Weiss made inquiries of the Gretsches as to the availability of the property. They were advised of the outstanding agreement with Moran and Goldberg. Moran and the Weisses got together, made some arrangements among themselves, and then the Weisses agreed to purchase the property in order to go ahead with the projected operation.

The Gretsches, in addition to the $3,250 cash which they had paid upon acquiring the property, had incurred other expenses in connection therewith, so that their cash investment was approximately between $5,000 and $6,000.

They agreed to sell the property to the Weisses. To save expense an arrangement was made whereby instead of having the Songood Company convey to the Weisses, the Gretsches surrendered their stock in the corporation (which was all that had been issued), and the stock was reissued to the Weisses. The Songood then executed a mortgage to the Gretsches in the sum of $12,858, which was the sum agreed upon by the parties as the value of the Gretsches' equity above the Bronx County mortgage of $30,000.

The mortgage recites that it is " to secure the payment of an indebtedness in the sum of $12,858 * * * to be paid as follows: $1,500 when the building was progressed to the first tier of beams; $500.00 when the said building had reached the third tier of beams; $750.00 when said building has reached the fourth tier of beams; $750.00 when said building has reached to the fifth tier of beams; $500.00 when said building has reached the sixth tier of beams; $5,000.00 when said building has reached enclosure with roof water tight; $2,000.00 when said building has reached the Brown Mortar Stage; $1,858.00 when said building has reached the White Mortar or Standing Trim Stage."

The mortgage further provided that it would be subordinated to a temporary building loan of $60,000, also to a permanent building loan mortgage of $300,000 to the Prudential, which was to replace the $60,000 temporary loan, and also to the $30,000 Bronx Trust Company mortgage. There were provisions also for the acceleration of some of the payments.

This mortgage also contained clause 16 heretofore set out in connection with the Bronx County Trust mortgage to the effect that the advances received should be held as a trust fund in accordance with the provisions of the Lien Law.

Although this mortgage is continuously referred to as a purchase-money mortgage it contains no recital to that effect. The proven facts, however, conclusively establish it to be such a mortgage.

Inquiry was made by the grand jury as to the reason for the inclusion of the provision required by section 13 of the Lien Law in the Songood mortgage to the Gretsches.

William C. Goodson was a witness before the grand jury. He is a lawyer and represented the Gretsches in some of the transactions herein. He testified that the mortgage was in statutory form. Speaking of the mortgage and the clause 16 he said: " It was drawn in statutory form, and all statutory forms contain that provision

now. It is printed into it." The original mortgage is not in evidence. Exhibit No. 1 is a typewritten certified copy of the original mortgage. It was drawn by Goodson. He is the only witness who testified as to how or why the clause was included. He testified further that " at the time the mortgage was made there were no creditors, and therefore it was immaterial whether the clause was incorporated." This point is stressed now for the following reason: Before the grand jury John M. Ireland, an assistant vice-president of the Bronx County Trust Company, was a witness. After testifying regarding the acquisition of the premises involved, the length of time they were held by the company, and their sale, his attention was directed to the Songood-Gretsch mortgage " executed on April 28, 1939, some months after this transaction with the Bronx County Trust Company."

The assistant district attorney then summarized the provisions relative to clause 16 and concluded as follows: " In other words, this $12,858 which was received, according to this mortgage, was agreeable to both sides as a trust fund for the payment of claims of contractors and material men." To which the witness made no reply. Indeed, it was apparent that he was hearing about matters of which he had no knowledge, and, so far as was apparent, no interest whatever.

The assistant district attorney was then sworn as a witness. He testified that he had made an investigation of the various transactions connected with the matter herein; he testified as to an examination of the Gretsches in the district attorney's office December 31, 1938, when those defendants were interrogated in the presence of their counsel. He testified as to his deductions of facts from the examination. A transcript of the statements of the Gretsches is in evidence. (Exhibit No. 6.) Neither that transcript nor the testimony of the Gretsches themselves before the grand jury substantiate the inferences declaimed to the grand jury. The assistant district attorney concluded his statement, or testimony, as follows: " I regard the important thing in connection with their [Gretsches] testimony as to that transaction, they admitted that in exchange for this mortgage that the Songood Company as such received nothing at all except the stock which they turned back to Songood Realty and subsequently turned back to the Weisses, who are the present owners of the land."

The circumstances under which that mortgage was given have been set forth herein. The reason the Gretsches' statement of the facts is important, so far as the criminal charges herein are concerned, is not apparent. No charge has been made that any one stole the proceeds of the Songood-Gretsch mortgage. The Gretsches

could not have stolen such proceeds, since, as they were the owners of the mortgage, they were entitled to the proceeds. The charges in the indictment are predicated upon the claim that the proceeds of subsequent loans were diverted contrary to law to discharge among other items part of the debt secured by the Songood-Gretsch mortgage.

That mortgage was executed and delivered April 28, 1938.

The building operation was begun and carried on by the Weisses in their ownership and control of Songood Corporation. In August, prior to the time the building had reached a stage when the first payment of $150,000 under the Prudential loan was due, the Weisses needed money. Eventually negotiations were opened with the Galway Realty Corporation for a temporary loan of $75,000. That concern was willing to make the loan, but as a condition precedent insisted that Songood or the Weisses first purchase what is referred to as the Clara street property. This consisted of a house and lot, the price of which was fixed at $6,500. The Weisses made a down payment of $1,000, but were unable to raise the balance. They appealed to the Gretsches for a loan of $5,500 to complete the purchase. The Gretsches declined to make the loan. After some negotiations it was arranged that a note should be made either by Songood or Anna Weiss, the wife of one of the Weisses. Herbert Gretsch testified that he agreed to be an indorser, if the note was signed or indorsed by Anna Weiss, and he was furnished with a surety company statement that she was worth $100,000. Such a statement was shown to him, and he and his brother and Goodson and Potts, the lawyers, indorsed a note for $6,000 made either by Songood or Mrs. Weiss, but to which both were parties either as maker or indorser. The Gretsches had the note discounted, and, after $600 was deducted as the expense of the loan and split between the Gretsches and Goodson and Potts, the balance of $5,400 was turned over to one of the Weisses, who added $100 to make up the $5,500 required to complete the purchase.

Title was taken in the name of Potts as a convenience. Within a day or two he conveyed to the Songood, subject to a mortgage of $3,250, which was taken as collateral to secure the indorsers against loss on the note. A check for $3,250 additional was given to the Gretsches; $600 of that sum was the bonus for obtaining the loan; the balance of $2,650 was applied to reducing the note upon which the $6,000 had been raised to enable the Clara street property to be purchased.

The charge in the first count of the indictment is that the $3,250 thus paid to the Gretsches was a diversion of part of the proceeds of the Galway temporary building loan for purposes other than the

cost of the improvement; that as such it was a violation of section 36 of the Lien Law and of section 1302 of the Penal Law; that the Songood Company at the time was indebted to a materialman in the sum of $7,525.47; and that the Weisses, as officers and directors, were thus guilty of grand larceny in the first degree, and that the Gretsches " having willfully and feloniously aided and abetted " the other defendants, " and counselled, induced and procured the other defendants " in the commission of said acts, and received and accepted the said sum of money in partial payment of said debt and obligation, being well aware and knowing that the said sum of money thus received by them was paid out of the trust fund theretofore created pursuant to the provisions of the Lien Law, " were equally guilty as principals of the crime of grand larceny in the second degree."

The Clara street premises having been sold by the Galway Company to the Songood or Weisses, the temporary building loan of $75,000 was consummated August 15, 1938.

The deed to the Clara street property was dated and executed August 9, 1938, and recorded August 18, 1938. On that day Potts conveyed the premises to Songood and took back the mortgage for $3,350, both of which were recorded the same day.

The Galway mortgage was executed August 15, 1938, and recorded August 16, 1938.

The agreement for the Galway loan was executed August 15, 1938. An affidavit of David Weiss, as president of Songood, verified August 15, 1938, is attached to the agreement. In that affidavit are set forth the items of expense, and, among others, is the sum of $13,611 to be used to discharge existing mortgages and other incumbrances. The total of the items is $15,171.75 and the sum stated to be available for the improvement out of the $75,000 is stated to be $59,888.25.

How the $13,611 was disbursed does not appear. At the time the Bronx County Trust Company mortgage in the sum of $30,000 was unsatisfied, as was the Songood-Gretsch mortgage in the sum of $12,858. At some time the Bronx Trust Company reduced its claim by $7,500, because of unforeseen difficulties which occasioned additional construction costs. The Gretsch mortgage was also reduced several thousand dollars. Both of those mortgages were subordinated to the mortgage given to secure the Galway loan. The terms of the Bronx Trust Company mortgage provided that upon payment of $15,000 the balance of the principal still due would be subordinated to a building loan mortgage on an apartment house building containing not less than 250 rooms, which said building loan mortgage shall be in a sum not greater than $1,000

per room, or to a permanent mortgage on an apartment house building not exceeding $1,000 per room, and provided further that said building loan mortgage or permanent mortgage shall be procured from a bank, trust company, savings bank or an insurance company doing business in the State of New York and under the jurisdiction of the New York State Banking or Insurance Departments, " which said institution shall make such loan out of its own funds and without participation whatsoever."

The Gretsch mortgage provided for its subordination to a temporary building loan mortgage of $60,000 and to a permanent building loan mortgage of $300,000, which such mortgage should displace the temporary building loan mortgage if made.

The Galway mortgage loan being in the amount of $75,000, and by an institution not within the clauses enumerated in the Bronx Trust Company, neither the Gretsches nor the trust company was obligated to subordinate to the Galway mortgage. Both did so, but under what terms does not appear. There is testimony that the Gretsches reduced their mortgage several thousand dollars and waived interest to help the loan go through.

Meanwhile the building operation was continued, and some time in October had progressed to a point when the first installment of $150,000 of the Prudential approved permanent loan of $300,000 was payable. So on October 28, 1938, a formal building loan contract for $300,000 was executed by the Songood and the Prudential. The contract was executed on behalf of Songood by " Thomas Moran, President." The same day a bond and mortgage in the sum of $300,000 on the premises were made by the Songood to the Prudential, both being executed on behalf of the Songood by " Thomas Moran, President."

The mortgage contained the clause that the moneys received constituted a trust fund for certain purposes as provided by section 13 of the Lien Law.

Upon the closing of the transaction the Prudential check for $150,000 was delivered to the Galway Realty Company together with a letter from the Songood signed by Thomas Moran, president, and another as secretary.

That letter is as follows:

" *October* 28th, 1938.

" Galway Realty Co., Inc.
  26 Court Street,
  Brooklyn, New York.

" Re: Premises on the northeast corner of Shore Road and 74th Street, Brooklyn.

" Gentlemen: In making its first payment to us on our building loan on the above property, the Prudential Insurance Company

of America has drawn one check in the amount of $150,000.00 to our order. If it is agreeable to you, we will indorse this check over to you and ask you to be good enough, after deducting the amount due you for principal and interest on your mortgages, to wit: $90,759.91, to draw checks for the difference as follows:

| | | |
|---|---:|---:|
| Bronx County Trust Company | $11,147 | 92 |
| Kingsway Plumbing Supply Co. Inc. | 12,000 | 00 |
| City Collector | 463 | 05 |
| Prudential Insurance Company of America | 750 | 00 |
| Robert Goldman | 2,250 | 00 |
| Norman S. Kempner | 750 | 00 |
| Home Title Insurance Company | 2,310 | 75 |
| Herbert & Louis Gretsch | 1,850 | 00 |
| Herbert & Louis Gretsch | 5,330 | 24 |
| Herbert & Louis Gretsch | 2,623 | 20 |
| Goodson & Potts | 850 | 00 |
| Songood Realty Co. Inc | 18,164 | 93 |
| Songood Realty Co. Inc | 750 | 00 |
| | $59,240 | 09 |

" In extending this courtesy you, of course, in no way, are to assume any responsibility or obligations of any kind in connection with the distribution of that difference. The above $750.00 check to us, we will indorse over to you and we ask you to cash same and to please have cash for that amount, the receipt of which cash we hereby acknowledge.

" Very truly yours,
" SONGOOD REALTY CO., INC.
By Thomas Moran, *Pres.*
By Nathan Weiss, *Secretary.*"

Enumerated among the payments to be made are one of $11,147.92 to the Bronx County Trust Company, one of $5,330.24 to the Gretsches. Both of those payments were on account of the mortgages then liens upon the property. Another payment to the Gretsches was directed to be made in the sum of $2,623.20. That sum evidently was to discharge another mortgage held by the Gretsches, apparently executed subsequent to the $12,858 mortgage held by them, but prior to the placing of the permanent building loan.

The larceny charge in the second count in the indictment is predicated upon the payment of the $5,330.24 to the Gretsches on account of the $12,858 mortgage out of the Prudential advance payment of $150,000 for the reason that there were then unpaid claims of materialmen.

Section 13 of the Lien Law regulates priority of liens for materials furnished or labor performed in the improvement of real property. Without setting out the section *in extenso*, it suffices to say generally that the priority prevails over any conveyance, judgment or other claim against the property, not recorded, docketed or filed at the time of the filing of the notice of such lien.

Subdivision 5 of section 13 provides as follows: " No instrument of conveyance recorded *subsequent* to the commencement of the improvement, and before the expiration of four months after the completion thereof, shall be valid as against liens filed within four months from the recording of such conveyance, unless the instrument contains a covenant by the grantor that he will receive the consideration for such conveyance as a trust fund to be applied first for the purpose of paying the cost of the improvement and that he will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose. * * * *Nothing in this subdivision shall apply to the consideration received by a grantor who, pursuant to a written agreement entered into and duly recorded prior to the commencement of the improvement, conveys to the person making such improvement, the land upon which such improvement is made.*" (Italics supplied.)

Section 36 of the Lien Law (*supra*), which the defendants are charged with violating, is as follows: " Owner who diverts funds guilty of larceny. The funds received by an owner under any and all advances made pursuant to a building loan contract and secured by a building loan mortgage and the funds received by an owner under every mortgage containing the covenant required by subdivision three of section thirteen of this chapter and by an owner under every instrument of conveyance containing the covenant required by subdivision five of section thirteen of this chapter are hereby declared to constitute trust funds in the hands of the owner to be applied first for the purpose of paying the cost of improvement, and any owner and any officer, director or agent of any owner who applies or consents to the application of such funds for any other purpose prior to paying the cost of improvement is guilty of larceny and punishable as provided in section thirteen hundred and two of the Penal Law."

" Cost of improvement " is defined in section 2 of the Lien Law.

Enumerated as included in the cost of improvement are " fair and reasonable sums paid for obtaining building loan and subsequent financing," and " sums paid to discharge or reduce the indebtedness under mortgages and accrued interest thereon and other encumbrances upon real estate existing prior to the time when the lien provided for in this chapter may attach. * * * The

application of the proceeds of any building loan mortgage or other mortgage to reimburse the owner for any payments made for any of the above mentioned items for said improvement prior to the date of the initial advance received under the building loan mortgage or other mortgage shall be deemed to be an expenditure within the ' cost of improvement ' as above defined; provided, however, such payments are itemized in the building loan contract and /or other mortgage other than a building loan mortgage, and provided further, that the payments have been made subsequent to the commencement of the improvement." (Lien Law, § 2.)

As heretofore pointed out, the Bronx Trust Company mortgage contained the trust clause (16) upon which much stress is laid by the People. There is no pretense that any crime was committed in the payments made to reduce and discharge that mortgage. Regardless of clause 16 it unquestionably is a purchase-money mortgage. The Gretsch mortgage is similar in all respects excepting that there was no transfer of title by the Songood Company to a purchaser. The transfer of interest was made in effect by a change in stock ownership of the Songood Corporation, and the mortgage executed by that corporation to the Gretsches was to secure the balance of the purchase price agreed to be paid by the new owners. If the transaction were legal and free from fraud, the Gretsches' position was no different from that of the Bronx County Trust Company and there was no fraud, no illegality, no crime in the transaction.

The Gretsches having transferred all of the outstanding stock of the Songood Corporation to the Weisses, they in turn could agree on behalf of the corporation to have a mortgage issued to secure the purchase price, so long as the rights of creditors were not affected. Songood had no creditors at the time, other than the Bronx County Trust Company. That concern had a first mortgage on the premises owned by the Songood, and that property constituted its entire assets. A subordinate mortgage could in no way impair the trust company's security. Under the circumstances the transaction was legal. (*Wolf* v. *Cohen*, 209 App. Div. 113; *Welch* v. *Importers & Traders' Nat. Bank*, 122 N. Y. 177; *Kassel* v. *Empire Tinware Co.*, 178 App. Div. 176.)

It is insisted, however, that the Gretsch mortgage is fraudulent as to then existing and future creditors by reason of the provisions of the Debtor and Creditor Law.

Section 275 of said law provides as follows: " Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors."

To declare a mortgage fraudulent as to subsequent creditors, there must be evidence that at the time of its execution and delivery the mortgagor contemplated incurring the indebtedness later incurred (*Matter of Decker*, 149 Misc. 364); and an absence of fair consideration to establish an intent to defraud. (*Strongin* v. *International Acceptance Bank, Inc.*, 70 F. [2d] 248.)

It is apparent that the evidence in this case would not sustain such contentions.

A more conclusive answer, however, is that the fraudulent character of any such conveyance could be established only in an action by creditors seeking to protect their rights; such an issue could not be determined on the trial of an indictment for larceny under section 36 of the Lien Law.

The first count in the indictment is predicated upon the Clara street property transaction. It is apparent that at the time the Songood Corporation and the Weisses were pressed for cash. The building operation was in progress; a temporary loan was essential; efforts to obtain one had been futile. The Galway Company was under no constraint to make a loan. If it elected to do so, it could dictate the terms upon which it would advance funds. If the terms were not met it could decline to make the loan. One of the conditions was the purchase in advance of the Clara street property. The Songood could get no funds to carry on the improvement except from Galway. It could get no loan from that concern unless that purchase were made. It had to be a separate transaction and the purchase price had to be found elsewhere than from the proceeds of the loan. However characterized, the cost of the Clara street property unquestionably was part of the expense of obtaining the loan. The Gretsches aided in furnishing the funds for the Clara street property. Without their aid, it could not have been purchased; the loan could not have been obtained from the Galway Company; the building project in all probability would have then collapsed. It is a far-fetched contention that the Gretsches, in lending their credit to obtain the funds to purchase the Clara street property, so that the Galway loan could be effected, so the building project could be continued, were engaged in a scheme to enrich themselves at the expense of materialmen and laborers. Even if it be conceded that the cost of the Galway loan was extravagant and unreasonable, it does not justify the charge that the Gretsches were involved in criminal acts. Whether under the circumstances there was a civil liability which might be enforced against them is of no concern. To be guilty of a larceny — and that is the charge — there must be an intent to steal. No such intent can be spelled out of the facts here.

Defendants further insist that the Gretsches having received the payments recited did so openly and under a claim of title preferred in good faith.

Section 1306 of the Penal Law provides as follows: "Upon an indictment for larceny it is a sufficient defense that the property was appropriated openly and avowedly, under a claim of title preferred in good faith, even though such claim is untenable."

The theory upon which the indictment is framed is that fraud permeated all of the transactions from the very outset. It is urged by the People that the divesting by the Gretsches of their interest in the Songood Company, and its acquisition by the Weisses was fraudulent — a scheme to cover the Gretsches' continuing interest and control of Songood and to camouflage their plan to divert building loan funds to their own profit. It is the felonious intent which constitutes larceny. "The statute makes the crime to consist in the intent to despoil the owner of his property. That is necessary to complete the offense and if a man, under the honest impression that he had a right to the property, takes it, it is not larceny, if there be a colorable title. * * * The charge of stealing property is only substantiated by establishing the felonious intent. Without it there is no crime; for it would be a bare trespass. It is the criminal mind and purpose going with the act, which distinguish the criminal trespass from a mere civil injury." (*People ex rel. Perkins* v. *Moss*, 187 N. Y. 410, 420.)

No necessity to determine this claim is apparent since the evidence before the grand jury fails to establish any intent on the part of the Gretsches to steal Songood's money.

Under the circumstances the court prefers not to base its decision on this contention. There should be some facts or circumstances established upon which an intent to steal could be predicated, before consideration of such a defense need be considered.

Stress is placed upon the fact that neither of the mortgages on account of which payments were made to the Gretsches are enumerated either in the building loan contract or mortgage as required by section 2 of the Lien Law. That raises the question whether persons who advance or loan money to owners or contractors engaged in building operations can be secure only if they have incorporated in such agreements or mortgages a statement that the loans made by them are of a character that includes them within the term "cost of improvement" as defined by the law. The propriety of such a requirement as to owners and contractors borrowing to carry on a building operation is apparent; to insist that the lenders should have the necessary recitals incorporated in the building agreements and mortgages, in order not alone to enable them to be repaid, but

to avoid criminal prosecution, seems too unreasonable to deserve serious consideration.

The eighth count in the indictment charges a conspiracy on behalf of the Weisses and the Gretsches and the Songood Corporation to violate the Lien Law by illegally diverting funds which were trust funds for the benefit of materialmen and laborers.

In examining into this claim a significant fact is disclosed, for which no explanation appears. Moran was neither indicted, nor was he a witness before the grand jury, yet running through the allegations in the indictment he seems to be a dominant and active figure.

It is unnecessary to analyze minutely the allegations of the conspiracy charge. Suffice to say the theory is far fetched, fantastic, incredible. Many of the allegations are wholly unsupported by evidence; many of the allegations are inconsistent with and contrary to the evidence. So far as the Gretsches are concerned no facts are established to sustain the charge against them.

It is said that this indictment is novel; that it is an attempt to coerce persons to pay debts for which they are not liable, by pressure of criminal proceedings; that the indictment has been found to test out a new theory as to liability under the Lien Law. Whatever may be the facts, the evidence does not establish a violation by the Gretsches of any provision of the Penal Law.

The motion is granted and the indictment as to the defendants Gretsch is dismissed.